GRACE PIERCE, PLAINTIFF-RESPONDENT, v. ORTHO PHARMACEUTICAL CORPORATION, DEFENDANT-APPELLANT.

Argued November 13, 1979—Decided July 28, 1980.

*Myron J. Bromberg* argued the cause for appellant (*Porzio & Bromberg*, attorneys; *Patricia A. Meyer* and *Myron J. Bromberg* on the brief).

*Ruth Russell Gray* argued the cause for respondent.

The opinion of the Court was delivered by

POLLOCK, J.

This case presents the question whether an employee at will has a cause of action against her employer to recover damages for the termination of her employment following her refusal to continue a project she viewed as medically unethical. Resolution of this question involves an examination of the common law doctrine of at will employment to determine whether we should adopt an exception to the rule allowing an employer to discharge an at will employee without cause.

Plaintiff, Dr. Grace Pierce, sued for damages after termination of her employment with defendant, Ortho Pharmaceutical Corporation. The trial judge granted defendant's motion for summary judgment. The Appellate Division reversed and remanded for a full trial. 166 *N.J.Super.* 335 (1979). We granted defendant's petition for certification. 81 *N.J.* 266 (1979). We now reverse the Appellate Division and reinstate the summary judgment granted by the Law Division.

I

Since the matter involves a motion for summary judgment, we glean the facts from the pleadings, affidavits, and depositions before the court on the motion, giving plaintiff the benefit of all reasonable inferences that may be drawn in her favor. *R.* 4:46–2.

Ortho specializes in the development and manufacture of therapeutic and reproductive drugs. Dr. Pierce is a medical doctor who was first employed by Ortho in 1971 as an Associate Director of Medical Research. She signed no contract except a secrecy agreement, and her employment was not for a fixed term. She was an employee at will. In 1973, she became the Director of Medical Research/Therapeutics, one of three major sections of the Medical Research Department. Her primary responsibilities were to oversee development of therapeutic drugs and to establish procedures for testing those drugs for safety, effectiveness, and marketability. Her immediate supervisor was Dr. Samuel Pasquale, Executive Medical Director.

In the spring of 1975, Dr. Pierce was the only medical doctor on a project team developing loperamide, a liquid drug for treatment of diarrhea in infants, children, and elderly persons. The proposed formulation contained saccharin. Although the concentration was consistent with the formula for loperamide marketed in Europe, the project team agreed that the formula was unsuitable for use in the United States. An alternative formulation containing less saccharin might have been· developed within approximately three months.

By March 28, however, the project team, except for Dr. Pierce, decided to continue with the development of loperamide. That decision was made apparently in response to a directive from the Marketing Division of Ortho. This decision meant that Ortho would file an investigational new drug application (IND) with the Federal Food and Drug Administration (FDA), continuing laboratory studies on loperamide, and begin work on a formulation. FDA approval is required before any new drug is tested clinically on humans. 21 *U.S.C.* § 355; 21 *C.F.R.* §§ 310.3 *et seq.* Therefore, loperamide would be tested on patients only if the FDA approved the saccharin formulation.

Dr. Pierce knew that the IND would have to be filed with and approved by the FDA before clinical testing could begin. Nonetheless, she continued to oppose the work being done on loperamide at Ortho. On April 21, 1975, she sent a memorandum to the project team expressing her disagreement with its decision

to proceed with the development of the drug. In her opinion, there was no justification for seeking FDA permission to use the drug in light of medical controversy over the safety of saccharin.

Dr. Pierce met with Dr. Pasquale on May 9 and informed him that she disagreed with the decision to file an IND with the FDA. She felt that by continuing to work on loperamide she would violate her interpretation of the Hippocratic oath. She concluded that the risk that saccharin might be harmful should preclude testing the formula on children or elderly persons, especially when an alternative formulation might soon be available.

Dr. Pierce recognized that she was joined in a difference of "viewpoints" or "opinion" with Dr. Pasquale and others at Ortho concerning the use of a formula containing saccharin. In her opinion, the safety of saccharin in loperamide pediatric drops was medically debatable. She acknowledged that Dr. Pasquale was entitled to his opinion to proceed with the IND. On depositions, she testified concerning the reason for her difference of opinion about the safety of using saccharin in loperamide pediatric drops:

Q   That was because in your medical opinion that was an unsafe thing to do. Is that so?

A   No. I didn't know. The question of saccharin was one of potential harm. It was controversial. Even though the rulings presently look even less favorable for saccharin it is still a controversial issue.

After their meeting on May 9, Dr. Pasquale informed Dr. Pierce that she would no longer be assigned to the loperamide project. On May 14, Dr. Pasquale asked Dr. Pierce to choose other projects. After Dr. Pierce returned from vacation in Finland, she met on June 16 with Dr. Pasquale to discuss other projects, but she did not choose a project at that meeting. She felt she was being demoted, even though her salary would not be decreased. Dr. Pierce summarized her impression of that meeting in her letter of resignation submitted to Dr. Pasquale the following day. In that letter, she stated:

Upon learning in our meeting June 16, 1975, that you believe I have not 'acted as a Director', have displayed inadequacies as to my competence, responsibility, productivity, inability to relate to the Marketing Personnel, that you, and

reportedly Dr. George Braun and Mr. Verne Willaman consider me to be non-promotable and that I am now or soon will be demoted, I find it impossible to continue my employment at Ortho.

The letter made no specific mention of her difference of opinion with Dr. Pasquale over continuing the work on loperamide. Nonetheless, viewing the matter most favorably to Dr. Pierce, we assume the sole reason for the termination of her employment was the dispute over the loperamide project. Dr. Pasquale accepted her resignation.

In her complaint, which was based on principles of tort and contract law, Dr. Pierce claimed damages for the termination of her employment. Her complaint alleged:

The Defendant, its agents, servants and employees requested and demanded Plaintiff follow a course of action and behavior which was impossible for Plaintiff to follow because of the Hippocratic oath she had taken, because of the ethical standards by which she was governed as a physician, and because of the regulatory schemes, both federal and state, statutory and case law, for the protection of the public in the field of health and human well-being, which schemes Plaintiff believed she should honor.

However, she did not specify that testing would violate any state or federal statutory regulation. Similarly, she did not state that continuing the research would violate the principles of ethics of the American Medical Association. She never contended her participation in the research would expose her to a claim for malpractice.

Ortho moved for summary judgment on two theories. The first was that Dr. Pierce's action for wrongful discharge was barred because she resigned. The trial judge denied the motion on that ground because he found that there was a fact question whether Ortho induced Dr. Pierce's resignation. However, the trial court granted Ortho's motion on the alternative ground that because Dr. Pierce was an employee at will, Ortho could end her employment for any reason. In reversing the trial court, the Appellate Division ruled that a plenary hearing was necessary before deciding whether to adopt an exception to the common law rule permitting an employer to fire an employee at will for any reason. 166 *N.J.Super.* at 342, 399 *A.2d* 1023.

## II

██ A motion for summary judgment is a means for the efficient disposition of a cause of action where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *R.* 4:46–2. Of course, courts should exercise appropriate caution in deciding issues involving policy considerations. *Jackson v. Muhlenberg Hospital*, 53 *N.J.* 138, 142 (1969). However, excessive caution would undercut the purposes of a motion for summary judgment, which provides a means for piercing the allegations of the pleadings to determine whether there are issues requiring disposition at trial. *Judson v. Peoples Bank & Trust Co. of Westfield*, 17 *N.J.* 67, 73–75 (1954). If, after drawing all inferences of doubt against the movant, a court finds that there is no genuine issue of material fact, it should enter summary judgment. *Id.* at 75. Applying those principles, we hold that even if she were discharged by Ortho, Dr. Pierce has not alleged facts that would support an action for damages for the termination of her employment.

As previously noted, there was a fact question whether Ortho induced Dr. Pierce to resign. Consequently, the trial judge properly denied summary judgment on the alternative ground that her resignation barred this action. That determination is not challenged on this appeal. Therefore, we do not reach the question whether resignation bars an action for wrongful discharge. *See, e. g., Donnelly v. United Fruit Co.*, 75 *N.J.Super.* 383 (App. Div. 1962), aff'd 40 *N.J.* 61 (1963).

As discussed below, our careful examination of Dr. Pierce's allegations and the record reveals no genuine issue of material fact requiring disposition at trial. Although this case raises important policy considerations, all the relevant facts are before us, and there is no reason to defer a decision. Accordingly, we reverse the Appellate Division and reinstate the summary judgment in favor of defendant.

## III

Under the common law, in the absence of an employment contract, employers or employees have been free to terminate

the employment relationship with or without cause. *Schlenk v. Lehigh Valley R.R. Co.*, 1 *N.J.* 131, 135 (1948) (railroad employee discharged for fighting). *See also English v. College of Medicine and Dentistry of New Jersey*, 73 *N.J.* 20, 23 (1977) (morgue supervisor discharged for failure to keep accurate records); *Jorgensen v. Pennsylvania R.R. Co.*, 25 *N.J.* 541, 554 (1958) (railroad employee discharged for theft).

The rule temporarily attained constitutional magnitude in *Adair v. United States*, 208 *U.S.* 161, 175, 28 *S.Ct.* 277, 280, 52 *L.Ed.* 436, 442 (1907), where the United States Supreme Court held unconstitutional a federal statute making it illegal for an employer to prohibit an employee from joining a union. *See also Coppage v. Kansas*, 236 *U.S.* 1, 13–14, 35 *S.Ct.* 240, 243, 59 *L.Ed.* 441, 446 (1914) (applying *Adair* to similar state statutes). As a corollary of the development of legislation, administrative regulation, and judicial decisions, the rule has since lost its constitutional protection. *See NLRB v. Jones & Laughlin Steel Corp.*, 301 *U.S.* 1, 57 *S.Ct.* 615, 81 *L.Ed.* 893 (1937).

In the last century, the common law developed in a laissez-faire climate that encouraged industrial growth and approved the right of an employer to control his own business, including the right to fire without cause an employee at will. *See* Comment, 26 *Hastings L.J.* 1434, 1441 (1975). The twentieth century has witnessed significant changes in socioeconomic values that have led to reassessment of the common law rule. Businesses have evolved from small and medium size firms to gigantic corporations in which ownership is separate from management. Formerly there was a clear delineation between employers, who frequently were owners of their own businesses, and employees. The employer in the old sense has been replaced by a superior in the corporate hierarchy who is himself an employee. We are a nation of employees. Growth in the number of employees has been accompanied by increasing recognition of the need for stability in labor relations.

Commentators have questioned the compatibility of the traditional at will doctrine with the realities of modern economics and employment practices. *See, e.g.,* Blades, *Employment at*

*Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power,* 67 *Colum. L. Rev.* 1404 (1967) [hereinafter cited as Blades]. The common law rule has been modified by the enactment of labor relations legislation. *See, e.g., NLRB v. Jones & Laughlin Steel Corp., supra.* The National Labor Relations Act and other labor legislation illustrate the governmental policy of preventing employers from using the right of discharge as a means of oppression. Blades, *supra* at 1418. Consistent with this policy, many states have recognized the need to protect employees who are not parties to a collective bargaining agreement or other contract from abusive practices by the employer.

Recently those states have recognized a common law cause of action for employees at will who were discharged for reasons that were in some way "wrongful". The courts in those jurisdictions have taken varied approaches, some recognizing the action in tort, some in contract. *See* Comment, 93 *Harv. L. Rev.* 1816, 1818–1824 (1980). Nearly all jurisdictions link the success of the wrongful discharged employee's action to proof that the discharge violated public policy.

In *Geary v. United States Steel Corp.,* 456 *Pa.* 171, 319 *A.*2d 174 (1974), a salesman employed at will was discharged after he expressed to the management his opinion that a new product was defective and dangerous. The court sustained the dismissal of the complaint because it revealed only that "there was a dispute over the merits of the new product," and because no public policy is violated when a company discharges an employee who is not qualified to make technical judgments for making "a nuisance of himself." 319 *A.*2d at 178–179. However, the court suggested that an action in tort might exist if a "clear mandate of public policy is violated." *Id.* at 180. *See Reuther v. Fowler & Williams, Inc.,* 255 *Pa.Super.* 28, 386 *A.*2d 119 (Super. Ct. 1978) (employee who was fired for taking time off for jury duty has cause of action for wrongful discharge); *see also Perks v. Firestone Tire & Rubber Co.,* 611 *F.*2d 1363 (3d Cir. 1979) (employee fired for refusal to take polygraph test has cause of action); *Lekich v. International Business Machines Corp.,* 469

*F.Supp.* 485 (E.D. Pa. 1979) (employee who made unauthorized long distance telephone calls had no cause of action); *Wehr v. Burroughs Corp.*, 438 *F.Supp.* 1052 (E.D. Pa. 1977) (cause of action recognized, but employee had alternative remedy for age discrimination).

In *Monge v. Beebe Rubber Co.*, 114 *N.H.* 130, 316 *A.2d* 549 (1974), the court allowed an at will employee to sue for breach of contract when she was dismissed after she refused to date the foreman. Balancing the employee's interest in maintaining employment, the employer's interest in running a business, and the public interest, the court held that termination motivated by bad faith or malice is not in the public interest and constitutes a breach of the employment contract. 316 *A.2d* at 551. *See Fortune v. National Cash Register Co.*, 364 *N.E.2d* 1251 (Mass. 1977) (employment contract, even at will, includes an implied covenant of good faith; employee has a cause of action when employer dismissed him to avoid paying a bonus); *Nees v. Hocks*, 272 *Or.* 210, 536 *P.2d* 512 (1975) (discharge of an employee for a "socially undesirable motive" held to be compensable; employee fired for serving on a jury).

Employees have recovered damages for wrongful discharge in a variety of contexts. It is well established that an employee has a cause of action where he is discharged in retaliation for filing a worker's compensation claim, even if the worker's compensation statute does not provide such a remedy. *See, e.g., Lally v. Copygraphics*, 173 *N.J.Super.* 162 (App. Div. 1980) appeal pending; *Kelsay v. Motorola, Inc.*, 74 *Ill.2d* 172, 23 *Ill.Dec.* 559, 384 *N.E.2d* 353 (1979); *Brown v. Transcom Lines*, 284 *Or.* 597, 588 *P.2d* 1087 (1978); *Sventko v. Kroger Co.*, 69 *Mich.App.* 644, 245 *N.W.2d* 151 (Ct. App. 1976); *Frampton v. Central Indiana Gas Co.*, 260 *Ind.* 249, 297 *N.E.2d* 425 (1973).

In a recent case the Supreme Court of California reversed a judgment sustaining a demurrer to the complaint of an employee who alleged he had been discharged because of his refusal to participate in an illegal scheme to fix retail prices. The court declared, "when an employer's discharge of an employee violates fundamental principles of public policy, the discharged employee

may maintain a tort action and recover damages traditionally available in such actions." *Tameny v. Atlantic Richfield Co.*, 27 *Cal.*3d 167, 170, 610 *P.*2d 1330, 1331, 164 *Cal.Rptr.* 839, 840 (1980). The court in *Tameny* relied on an earlier decision, *Petermann v. International Brotherhood of Teamsters*, 174 *Cal.App.*2d 184, 344 *P.*2d 25 (Ct. App. 1959), which allowed an employee who was discharged for his refusal to give false answers to a legislative committee to sue because of the public policy against the solicitation of perjury.

In *Perks v. Firestone Tire & Rubber Co.*, *supra*, the employee was discharged after refusing to submit to a lie detector test. Because Pennsylvania had a statute prohibiting conditioning employment on the taking of such tests, the discharge was against public policy. An employee who was discharged for trying to convince his employer to comply with the consumer credit laws prevailed because the laws demonstrated a clear public policy of protecting consumers. *Harless v. First National Bank in Fairmont*, 246 *S.E.*2d 270 (W.Va. 1978).

One New Jersey court has recognized an action for wrongful discharge. In *O'Sullivan v. Mallon*, 160 *N.J.Super.* 416 (Law Div. 1978), an x-ray technician alleged she was discharged after refusing to perform catheterizations. The court noted that it would have been illegal for an x-ray technician to perform those procedures and denied defendant's motion to dismiss the complaint for failure to state a cause of action.

In evaluating claims for wrongful discharge, courts have been careful not to interfere with the employer's right to make business decisions and to choose the best personnel for the job. In *Lampe v. Presbyterian Medical Center*, 590 *P.*2d 513 (Colo. App. 1979), a nurse was discharged after refusing to reduce her staff's overtime as requested. She felt that the reduction would jeopardize the health of the patients. In dismissing the complaint, the court recognized that the employer must be free to hire someone who was able to manage the staff without endangering patients. The court held that a statute containing general principles pertaining to the licensing of nurses did not create a cause of action. *Id.* at 515–517.

The employee in *Percival v. General Motors Corp.*, 400 *F.Supp.* 1322 (E.D. Mo. 1975), aff'd 539 *F.*2d 1126 (8th Cir. 1976), was fired in retaliation for his attempt "to correct false impressions given by the corporation to outside business associates and to urge corporate management itself to correct misleading information conveyed to the public . . . ." 400 *F.Supp.* at 1324. The court held that no clear mandate of public policy was involved and entered summary judgment in favor of defendant. *Id.* The court of appeals emphasized the rights of the employer and the need to give the employer wide latitude in running the business. 539 *F.*2d at 1130. *See also Larsen v. Motor Supply Co.*, 117 *Ariz.* 507, 573 *P.*2d 907 (1978) (requirement of consent to take a psychological stress evaluation test did not contravene any statute protecting the rights of employees); *Jackson v. Minidoka Irrigation Dist.*, 98 *Idaho* 330, 563 *P.*2d 54 (1977) (discharge for participating in an unauthorized Christmas party fund did not violate public policy); *Martin v. Platt*, 386 *N.E.*2d 1026 (Ind. App. 1979) (no "declared" public policy forbids discharge in retaliation for reporting a supervisor for taking kickbacks); *Scroghan v. Kraftco Corp.*, 551 *S.W.*2d 811 (Ky. App. 1977) (discharge of employee who announced his intention to attend law school at night did not violate public policy); *Trombetta v. Detroit, Toledo & Ironton R. Co.*, 81 *Mich.App.* 489, 265 *N.W.*2d 385 (Ct. App. 1978) (although employee stated claim by alleging he was fired for refusing to alter pollution control reports, summary judgment granted employer because employee did not contest affidavit that he had been demoted for insubordination).

Several states have declined to adopt a public policy exception to the at will doctrine. *See, e.g., Martin v. Tapley*, 360 *So.*2d 708 (Ala. 1978) (employee alleged discharge in retaliation for filing worker's compensation claim); *Hinrichs v. Tranquilaire Hosp.*, 352 *So.*2d 1130 (Ala. 1977) (employee alleged she was fired for refusing to falsify medical records); *Segal v. Arrow Industrial Corp.*, 364 *So.*2d 89 (Fla. Ct. App. 1978) (employee alleged discharge in retaliation for filing worker's compensation claim).

This Court has long recognized the capacity of the common law to develop and adapt to current needs. *Jersey Shore Medical Center—Fitkin Hospital v. Baum*, 84 *N.J.* 137, 149 (1980); *Collopy v. Newark Eye and Ear Infirmary*, 27 *N.J.* 29, 43–44 (1958). The interests of employees, employers, and the public lead to the conclusion that the common law of New Jersey should limit the right of an employer to fire an employee at will.

## IV

In recognizing a cause of action to provide a remedy for employees who are wrongfully discharged, we must balance the interests of the employee, the employer, and the public. Employees have an interest in knowing they will not be discharged for exercising their legal rights. Employers have an interest in knowing they can run their businesses as they see fit as long as their conduct is consistent with public policy. The public has an interest in employment stability and in discouraging frivolous lawsuits by dissatisfied employees.

Although the contours of an exception are important to all employees at will, this case focuses on the special considerations arising out of the right to fire an employee at will who is a member of a recognized profession. One writer has described the predicament that may confront a professional employed by a large corporation:

> Consider, for example, the plight of an engineer who is told that he will lose his job unless he falsifies his data or conclusions, or unless he approves a product which does not conform to specifications or meet minimum standards. Consider also the dilemma of a corporate attorney who is told, say in the context of an impending tax audit or antitrust investigation, to draft backdated corporate records concerning events which never took place or to falsify other documents so that adverse legal consequences may be avoided by the corporation; and the predicament of an accountant who is told to falsify his employer's profit and loss statement in order to enable the employer to obtain credit. [Blades, *supra* at 1408–1409 (footnotes omitted)]

Employees who are professionals owe a special duty to abide not only by federal and state law, but also by the recognized codes of ethics of their professions. That duty may oblige them to decline to perform acts required by their employers.

However, an employee should not have the right to prevent his or her employer from pursuing its business because the employee perceives that a particular business decision violates the employee's personal morals, as distinguished from the recognized code of ethics of the employee's profession. *See* Comment, 28 *Vand. L. Rev.* 805, 832 (1975).

██ We hold that an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy. The sources of public policy include legislation; administrative rules, regulations or decisions; and judicial decisions. In certain instances, a professional code of ethics may contain an expression of public policy. However, not all such sources express a clear mandate of public policy. For example, a code of ethics designed to serve only the interests of a profession or an administrative regulation concerned with technical matters probably would not be sufficient. Absent legislation, the judiciary must define the cause of action in case-by-case determinations. An employer's right to discharge an employee at will carries a correlative duty not to discharge an employee who declines to perform an act that would require a violation of a clear mandate of public policy. However, unless an employee at will identifies a specific expression of public policy, he may be discharged with or without cause.

██ An employee who is wrongfully discharged may maintain a cause of action in contract or tort or both. An action in contract may be predicated on the breach of an implied provision that an employer will not discharge an employee for refusing to perform an act that violates a clear mandate of public policy. *Cf. Vasquez v. Glassboro Services, Inc.*, 83 *N.J.* 86 (1980).

An action in tort may be based on the duty of an employer not to discharge an employee who refused to perform an act that is a violation of a clear mandate of public policy. In a tort action, a court can award punitive damages to deter improper conduct in an appropriate case. *DiGiovanni v. Pessel*, 55 *N.J.* 188, 190–191 (1970); Prosser, *Torts* § 2 at 9 (1971); 28 *Vand. L. Rev.*, *supra* at 836. That remedy is not available under the law of

contracts. *See, e. g.,* Corbin, *Contracts* § 1077 at 367 (1951). Our holding should not be construed to preclude employees from alleging a breach of the express terms of an employment agreement. Despite the dissent's unaccountable suggestion to the contrary, Dr. Pierce did not assert the breach of any specific contractual provision as a basis for relief. *See post* at 85–86.

■ Employees will be secure in knowing that their jobs are safe if they exercise their rights in accordance with a clear mandate of public policy. On the other hand, employers will know that unless they act contrary to public policy, they may discharge employees at will for any reason. Finally, our holding protects the interest of the public in stability of employment and in the elimination of frivolous lawsuits. Courts allowing at will employees to sue for wrongful discharge have expressed concern that employees will file groundless suits. *See, e. g., Geary v. United States Steel Co.,* 319 *A.2d* at 179. Commentators have also noted that disgruntled employees may be encouraged to bring vexatious suits. *See, e. g.,* Blades, *supra* at 1428. However, the standard enunciated above provides a workable means to screen cases on motions to dismiss for failure to state a cause of action or for summary judgment. If an employee does not point to a clear expression of public policy, the court can grant a motion to dismiss or for summary judgment.

## V

We now turn to the question whether Dr. Pierce was discharged for reasons contrary to a clear mandate of public policy. As previously stated, granting Ortho's motion for summary judgment is appropriate at this juncture only if there is no genuine issue as to any material fact.

■ The material facts are uncontroverted. In opposing the motion for summary judgment, Dr. Pierce did not contend that saccharin was harmful, but that it was controversial. Because of the controversy, she said she could not continue her work on loperamide. Her supervisor, Dr. Pasquale, disagreed and thought that research should continue.

As stated above, before loperamide could be tested on humans, an IND had to be submitted to the FDA to obtain approval for such testing. 21 *U.S.C.* § 355. The IND must contain complete manufacturing specifications, details of pre-clinical studies (testing on animals) which demonstrate the safe use of the drug, and a description of proposed clinical studies. The FDA then has 30 days to withhold approval of testing. 21 *C.F.R.* § 312.1. Since no IND had been filed here, and even giving Dr. Pierce the benefit of all doubt regarding her allegations, it is clear that clinical testing of loperamide on humans was not imminent.

Dr. Pierce argues that by continuing to perform research on loperamide she would have been forced to violate professional medical ethics expressed in the Hippocratic oath. She cites the part of the oath that reads: "I will prescribe regimen for the good of my patients according to my ability and my judgment and never do harm to anyone." Clearly, the general language of the oath does not prohibit specifically research that does not involve tests on humans and that cannot lead to such tests without governmental approval.

We note that Dr. Pierce did not rely on or allege violation of any other standards, including the "codes of professional ethics" advanced by the dissent. *Post* at 77–82. Similarly, she did not allege that continuing her research would constitute an act of medical malpractice or violate any statute, including *N.J.S.A.* 45:9–16(h). *See post* at 82.

In this case, Dr. Pierce has never contended that saccharin would necessarily cause harm to anyone. She alleged that the current controversy made continued investigation an unnecessary risk. However when she stopped work on loperamide, there was no risk. Our point here is not that participation in unethical conduct must be imminent before an employee may refuse to work. *See post* at 84. The more relevant consideration is that Dr. Pierce does not allege that preparation and filing of the IND was unethical. Further Dr. Pierce does not suggest that Ortho would have proceeded with human testing without FDA approval. The case would be far different if Ortho had filed the IND, the FDA had disapproved it, and

Ortho insisted on testing the drug on humans. The actual facts are that Dr. Pierce could not have harmed anyone by continuing to work on loperamide.

Viewing the matter most favorably to Dr. Pierce, the controversy at Ortho involved a difference in medical opinions. Dr. Pierce acknowledged that Dr. Pasquale was entitled to his opinion that the oath did not forbid work on loperamide. Nonetheless, implicit in Dr. Pierce's position is the contention that Dr. Pasquale and Ortho were obliged to accept her opinion. Dr. Pierce contends, in effect, that Ortho should have stopped research on loperamide because of her opinion about the controversial nature of the drug.

Dr. Pierce espouses a doctrine that would lead to disorder in drug research. Under her theory, a professional employee could redetermine the propriety of a research project even if the research did not involve a violation of a clear mandate of public policy. Chaos would result if a single doctor engaged in research were allowed to determine, according to his or her individual conscience, whether a project should continue. *Cf. Report of the Ad Hoc Committee on the Principles of Medical Ethics,* American Medical Association 3 (1979). An employee does not have a right to continued employment when he or she refuses to conduct research simply because it would contravene his or her personal morals. An employee at will who refuses to work for an employer in answer to a call of conscience should recognize that other employees and their employer might heed a different call. However, nothing in this opinion should be construed to restrict the right of an employee at will to refuse to work on a project that he or she believes is unethical. In sum, an employer may discharge an employee who refuses to work unless the refusal is based on a clear mandate of public policy.

As stated above, the thrust of Dr. Pierce's complaint is not that saccharin is dangerous, but that it is controversial. At oral argument, Dr. Pierce's attorney conceded that she did not intend to submit the question of the safety of saccharin to the jury. That is, plaintiff did not intend to adduce expert testimony demonstrating the dangers of the formulation of loperamide

containing the proposed level of saccharin. *Cf. Jackson v. Muhlenberg Hospital, supra,* 53 *N.J.* at 142–143. As a matter of law, there is no public policy against conducting research on drugs that may be controversial, but potentially beneficial to mankind, particularly where continuation of the research is subject to approval by the FDA. Consequently, although we recognize an employee may maintain an action for wrongful discharge, we hold there are no issues of material fact to be resolved at trial. *See Trombetta v. Detroit, Toledo & Ironton R. Co., supra.*

Under these circumstances, we conclude that the Hippocratic oath does not contain a clear mandate of public policy that prevented Dr. Pierce from continuing her research on loperamide. To hold otherwise would seriously impair the ability of drug manufacturers to develop new drugs according to their best judgment. *See Percival v. General Motors Corp., supra,* 539 *F.*2d at 1130; *Geary v. United States Steel Corp., supra,* 319 *A.*2d at 179–180.

The legislative and regulatory framework pertaining to drug development reflects a public policy that research involving testing on humans may proceed with FDA approval. The public has an interest in the development of drugs, subject to the approval of a responsible management and the FDA, to protect and promote the health of mankind. Research on new drugs may involve questions of safety, but courts should not preempt determination of debatable questions unless the research involves a violation of a clear mandate of public policy. Where pharmaceutical research does not contravene a clear mandate of public policy, the extent of research is controlled by regulation through the FDA, liability in tort, and corporate responsibility.

Accordingly, we reverse the judgment of the Appellate Division and remand the cause to the trial court for entry of judgment for defendant.

PASHMAN, J., dissenting.

I agree with the majority's ruling that a professional employee may not be discharged for refusing to violate a clearly

recognized legal or ethical obligation imposed on members of his profession. However, the majority's application of this principle defies logical explanation and disregards established judicial doctrine on the propriety of summary judgment. The majority further errs by assuming that the absence of a written agreement signifies beyond dispute that plaintiff's employment was strictly at the will of the drug manufacturer. I therefore respectfully dissent.

The majority's analysis recognizes that the ethical goals of professional conduct are of inestimable social value. By maintaining informed standards of conduct, licensed professions bring to the problems of their public responsibilities the same expertise that marks their calling. The integrity of codes of professional conduct that result from this regulation deserves judicial protection from undue economic pressure. Employers are a potential source of this pressure, for they can provide or withhold—until today, at their whim—job security and the means of enhancing a professional's reputation. Thus, I completely agree with the majority's ruling that "an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy" as expressed in a "professional code of ethics." *Ante* at 72.

The Court pronounces this rule for the first time today. One would think that it would therefore afford plaintiff an opportunity to seek relief within the confines of this newly announced cause of action. By ordering the grant of summary judgment for defendant, however, the majority apparently believes that such an opportunity would be an exercise in futility. I fail to see how the majority reaches this conclusion. There are a number of detailed, recognized codes of medical ethics that proscribe participation in clinical experimentation when a doctor perceives an unreasonable threat to human health. Any one of these codes could provide the "clear mandate of public policy" that the majority requires.

The "Declaration of Helsinki" of the World Medical Association established guidelines for conducting medical experimentation on humans. The declaration was adopted in 1962 and

revised by the 18th World Medical Assembly at Helsinki, Finland, in 1964. 4 *Encyclopedia of Bioethics* 1769 (Reich ed. 1978). The House of Delegates of the American Medical Association gave official endorsement to the principles of this declaration at its annual convention in 1966. *Id.* at 1773. The 1964 declaration provides in part as follows:

> In the field of clinical research a fundamental distinction must be recognized between clinical research in which the aim is essentially therapeutic for a patient, and the clinical research, the essential object of which is purely scientific and without therapeutic value to the person subjected to the research.
>
> I. Basic Principles
>
>     *      *      *      *      *      *      *      *
>
> 3. Clinical research cannot legitimately be carried out unless the importance of the objective is in proportion to the inherent risk to the subject.
>
>     *      *      *      *      *      *      *      *
>
> II. Clinical Research Combined with Professional Care
>
>     *      *      *      *      *      *      *      *
>
> 2. The doctor can combine clinical research with professional care, the objective being the acquisition of new medical knowledge, only to the extent that clinical research is justified by its therapeutic value for the patient.
>
> III. Non-Therapeutic Clinical Research
>
> 1. In the purely scientific application of clinical research carried out on a human being, it is the duty of the doctor to remain the protector of the life and health of that person on whom clinical research is being carried out.
>
>     *      *      *      *      *      *      *      *
>
> 4b. * * * The investigator or the investigating team should discontinue the research if in his or their judgment, it may, if continued, be harmful to the individual. [*Id.* at 1770–1771] [1]

The Declaration of Helsinki was revised in 1975 by the 29th World Medical Assembly in Tokyo, Japan. See *id.* at 1769. As amended, the declaration includes the following additional provisions:

> I. Basic Principles
>
>     *      *      *      *      *      *      *      *

---

[1] The United States Food and Drug Administration (FDA) has expressly adopted these guidelines as minimum standards for clinical studies conducted outside the United States which the FDA will consider as part of a new drug application. 21 *C.F.R.* § 312.20(b)(1)(iv) (1980).

7. Doctors should abstain from engaging in research projects involving human subjects unless they are satisfied that the hazards involved are believed to be predictable. Doctors should cease any investigation if the hazards are found to outweigh the potential benefits.

\* \* \* \* \* \* \* \*

II. Medical Research Combined with Professional Care (Clinical Research)

\* \* \* \* \* \* \* \*

2. The potential benefits, hazards and discomfort of a new method should be weighed against the advantages of the best current diagnostic and therapeutic methods.

3. In any medical study, every patient—including those of a control group, if any—should be assured of the best proven diagnostic and therapeutic method.

III. Non-therapeutic Biomedical Research Involving Human Subjects (Non-clinical Biomedical Research)

1. In the purely scientific application of medical research carried out on a human being, \* \* \* [t]he subjects should be volunteers—either healthy persons or patients for whom the experimental design is not related to the patient's illness. [*Id.* at 1772–1773]

The American Medical Association has also drafted and adopted its own ethical guidelines for clinical investigations. See Judicial Council, American Medical Association, *Opinions and Reports of the Judicial Council* 24–26 (1979); 4 *Encyclopedia of Bioethics, supra,* at 1773. These guidelines state in part:

(2) In conducting clinical investigation, the investigator should demonstrate the same concern and caution for the welfare, safety, and comfort of the person involved as is required of a physician who is furnishing medical care to a patient independent of any clinical investigation.

(3) In clinical investigation *primarily for treatment*—

A. The physician must recognize that the physician-patient relationship exists and that he is expected to exercise his professional judgment and skill in the best interest of the patient.

\* \* \* \* \* \* \* \*

(4) In clinical investigation *primarily for the accumulation of scientific knowledge*—

A. Adequate safeguards must be provided for the welfare, safety and comfort of the subject.

\* \* \* \* \* \* \* \*

C. Minors or mentally incompetent persons may be used as subjects only if:

i. The nature of the investigation is such that mentally competent adults would not be suitable subjects.[2]

[*Opinion and Reports of the Judicial Council, supra,* at 24–25 (emphasis in original; footnote added)]

A final source of ethical guidelines is what is now called the "Nuremberg Code," a statement of principles included in the Nuremberg Military Tribunal's decision in *United States v. Karl Brandt.* See 4 *Encyclopedia of Bioethics, supra,* at 1764. The Judicial Council of the American Medical Association has adopted the Nuremberg Code as one expression of ethical principles governing human experimentation. See *Opinions and Reports of the Judicial Council, supra,* at 33. The code states in part:

5. No experiment should be conducted where there is an *a priori* reason to believe that death or disabling injury will occur; except, perhaps, in those experiments where the experimental physicians also serve as subjects.

6. The degree of risk to be taken should never exceed that determined by the humanitarian importance of the problem to be solved by the experiment.

7. Proper preparations should be made and adequate facilities provided to protect the experimental subject against even remote possibilities of injury, disability, or death.

      \*      \*      \*      \*      \*      \*      \*      \*

10. During the course of the experiment the scientist in charge must be prepared to terminate the experiment at any stage, if he has probable cause to believe, in the exercise of the good faith, superior skill and careful judgment required of him that a continuation of the experiment is likely to result in injury, disability, or death to the experimental subject.

["Permissible Medical Experiments," 2 *Trials of War Criminals before the Nuremberg Military Tribunals under Control Council Law No. 10: Nuremberg October 1946–April 1949* at 181–182 (n. d.) (quoted in 4 *Encyclopedia of Bioethics, supra,* at 1764–1765)]

Each of these four "codes of professional ethics" establish standards for the participation of doctors in clinical experimentation on humans. Both the source and the content of each set of guidelines provide persuasive evidence that each is a "clear mandate of public policy." Each also provides the basis for denying defendant summary judgment. Plaintiff should receive the opportunity to prove at trial that she was discharged for her refusal to violate one or more of these ethical standards.

---

[2]This provision might have been relevant at trial. The present record is unclear as to whether plaintiff objected specifically to the use of young children in the proposed clinical testing program.

On defendant's motion for summary judgment, the majority properly assumes the truth of plaintiff's allegations that "the current controversy [regarding the carcinogenic potential of saccharin] made continued investigation an unnecessary risk." *Ante* at 74. There is certainly enough evidence in the present record to create a "genuine issue as to [this] material fact," *R.* 4:46–2. The majority notes that a safer alternative formulation of the new drug under investigation "might have been developed within approximately three months." *Ante* at 62. The record contains no clear indication of the likelihood that the safer formula would have been developed. Since on a motion for summary judgment "[a]ll inferences of doubt are drawn against the movant in favor of the opponent of the motion," *Judson v. Peoples Bank & Trust Co. of Westfield,* 17 *N.J.* 67, 75 (1954); see, *e. g., United Rental Equip. Co. v. Aetna Life & Cas. Ins. Co.,* 74 *N.J.* 92, 99 (1977); *Beadling v. Sirotta,* 39 *N.J.* 34, 35 (1962), we must assume at the present time that the successful development of the safer alternative was imminent. The risks attending the formula proposed by defendant are more evident. As the majority notes, the project team developing the proposed drug formula "agreed that the formula was unsuitable for use in the United States," *ante* at 62. Their agreement apparently persisted until defendant made what at present appears to have been a purely profit-motivated exercise in "corporate responsibility," see *ante* at 76: to proceed with development notwithstanding the "unnecessary risk," *ante* at 74.

Each of the previously described codes of medical ethics would prohibit plaintiff from conducting clinical experimentation where unnecessary medical risks have economic profit as their only justification. The original Declaration of Helsinki proscribes experimentation combined with professional care unless it "is justified by its therapeutic value for the patient," *supra* at 78. Non-therapeutic research may not be conducted if, in the judgment of the investigator, it would be "harmful to the individual [test subject]." *Id.* The 1975 revision of the declaration also prohibits doctors from conducting experiments where they are not satisfied that the possible hazards are predictable,

or where they outweigh the potential benefits. *Supra* at 79. Where the research program has a therapeutic purpose, the doctor may conduct experiments only where he weighs the proposal against other courses of treatment and concludes it is "the best proven * * * therapeutic method." *Id.* The American Medical Association's own guidelines also make participation in clinical experimentation contingent upon the doctor's professional judgment regarding "the welfare, safety, and comfort of the [test subject]," and the "best interest of the patient." *Supra* at 79. Finally, the Nuremberg Code similarly conditions a doctor's participation on his "good faith, superior skill and careful judgment" that the experiment is safe. *Supra* at 80.

At this stage of the litigation—when all disputed factual issues must be resolved against defendant—plaintiff is entitled to claim the protection of one or more of these recognized codes of professional ethics. I therefore conclude that plaintiff should have an opportunity to prove those facts which may entitle her to relief under the majority's newly promulgated cause of action.

This opportunity to prove a discharge in violation of public policy is not based solely on recognized codes of professional ethics. There is also a legislative prohibition of conduct by physicians that endangers life or health. To regulate the professional behavior of doctors, the Legislature has empowered the State Board of Medical Examiners to grant, suspend or revoke licenses to practice medicine within the State. See *N.J.S.A.* 45:9-6, -16. The statute enumerating the Board's powers provides in part:

> The [B]oard may refuse to grant or may suspend or revoke a license * * * to practice medicine * * * upon proof * * * of gross malpractice or gross neglect in the practice of medicine which has endangered the health or life of any person * * *.

[*N.J.S.A.* 45:9-16(h)]

This statutory prohibition of "gross malpractice or gross neglect" establishes another "clear mandate of public policy" which plaintiff should be allowed to invoke. Assuming without

deciding that the infliction of unnecessary medical risks—the specific conduct plaintiff refused to perform—might have constituted "gross malpractice," I find not even the attempt by defendant to refute such a claim. If plaintiff could prove that defendant discharged her for refusing to engage in "gross malpractice," defendant would be liable for its violation of a "clear mandate of public policy." I would permit plaintiff to demonstrate at trial that her discharge was a response to her refusal to violate statutory policy as well as several codes of medical ethics.

The majority denies plaintiff this opportunity. I do not understand why. Nothing is more unfair than stating a novel principle of law for the first time on an appeal, but denying the plaintiff who sought relief under some new standard an opportunity to conform his proof to the specific requirements actually adopted. Yet it appears the majority has done precisely that. Although plaintiff might have prevailed at trial under the majority's rule by invoking one or more of the standards I have described, the majority does not acknowledge this possibility. It rejects plaintiff's claim under its new principle of law without showing any sensitivity to the parties' earlier unawareness of the new rule.

The ostensible reason for the majority's rejection is that plaintiff "did not rely on or allege violation of any other standards" besides the Hippocratic Oath. *Ante* at 74. Yet, the majority's own opinion conclusively shows this statement to be inaccurate. As the majority notes, plaintiff asserted in her complaint that her participation in the proposed drug program would have been in violation of "ethical standards" *other than* the broad mandate or her Hippocratic Oath. See *ante* at 63–64. Thus, the majority's stated reason for upholding summary judgment contradicts its own description of plaintiff's claims. It may be that the majority dismisses these claims because plaintiff did not allege them specifically. But this rationale would reject a possibly valid claim for a formal defect in pleading—a result our courts have long eschewed. See, *e.g.*, *Saia v. Bellizio*, 53 *N.J.* 24, 27–28 (1968); *Muniz v. United*

.*Hospitals Med. Cen. Presbyterian Hosp.*, 153 *N.J.Super.* 79 (App. Div. 1977); *Swisscraft Novelty Co., Inc. v. Alad Realty Corp.*, 113 *N.J.Super.* 416, 425 (App.Div. 1971). The result becomes even more difficult to justify when one recognizes the source of the defect: the application of a new rule of law to pleadings drafted and discovery conducted in complete ignorance of that rule. Such a result is unacceptable, for at bottom it effectively denies plaintiff a meaningful day in court.

Three other points made by the majority require discussion, for they reflect the majority's failure to follow the well-established rule that the claims of a party opposing summary judgment are to be "indulgently treated," *Judson, supra*, 17 *N.J.* at 75. The first is the majority's characterization of the effect of plaintiff's ethical position. It appears to believe that Dr. Pierce had the power to determine whether defendant's proposed development program would continue at all. See *ante* at 75. This is not the case, nor is plaintiff claiming the right to halt defendant's developmental efforts. Interpreted "indulgently," yet realistically, plaintiff claims only the right to her professional autonomy. She contends that she may not be discharged for expressing her view that the clinical program is unethical or for refusing to continue her participation in the project. She has done nothing else to impede continued development of defendant's proposal; moreover, it is undisputed that defendant was able to continue its program by reassigning personnel. Thus, the majority's view that granting doctors a right to be free from abusive discharges would confer on any one of them complete veto power over desirable drug development, *ante* at 75, is ill-conceived.

The second point concerns the role of governmental approval of the proposed experimental program. In apparent ignorance of the past failures of official regulation to safeguard against pharmaceutical horrors,[3] the majority implies that the necessity

---

[3]See, *e.g., Sindell v. Abbott Laboratories*, 26 *Cal.*3d 588, 607 *P.*2d 924, 163 *Cal.Rptr.* 132 (Sup.Ct. 1980); *Mahr v. G. D. Searle & Co.*, 72 *Ill.App.*3d 540, 390 *N.E.*2d 1214, 28 *Ill.Dec.* 624 (App.Ct. 1979); *Lyons v. Premo Pharmaceu-*

for administrative approval for human testing eliminates the need for active, ethical professionals within the drug industry. See *ante* at 62, 73–75 & 75–76. But we do not know whether the United States Food and Drug Administration (FDA) would be aware of the safer alternative to the proposed drug when it would pass upon defendant's application for the more hazardous formula. The majority professes no such knowledge. We must therefore assume the FDA would have been left in ignorance. This highlights the need for ethically autonomous professionals within the pharmaceutical industry—a need which the majority's approach does nothing to satisfy.

The final point to which I must respond is the majority's observation that plaintiff expressed her opposition prematurely, before the FDA had approved clinical experimentation. See *ante* at 73–75. Essentially, the majority holds that a professional employee may not express a refusal to engage in illegal or clearly unethical conduct until his actual participation and the resulting harm is imminent. This principle grants little protection to the ethical autonomy of professionals that the majority proclaims. Would the majority have Dr. Pierce wait until the first infant was placed before her, ready to receive the first dose of a drug containing 44 times the concentration of saccharin permitted in 12 ounces of soda?[4] The majority minimizes the scope of plaintiff's ethical obligation. The "clear mandate of public policy" was no less clear when she made known her opposition and refusal to participate. A professional's opposition to unethical conduct should not be considered untimely when its unethical nature is apparent. By contrast, the majority's requirement that proposed conduct be imminent

---

*tical Labs, Inc.*, 170 *N.J.Super.* 183 (App.Div. 1979), certif. den., 82 *N.J.* 267 (1979); see also McGarity & Shapiro, "The Trade Secret Status of Health and Safety Testing Information: Reforming Agency Disclosure Policies," 93 *Harv. L.Rev.* 837, 840–844 (1980).

[4]There is at present undisputed evidence in the record that the amount of saccharin in the proposed drug formulation is this high. These limits on saccharin in soft drinks are those imposed by the FDA at the time the parties were conducting discovery.

would require, for example, an associate in a law firm to withhold his opposition to the preparation of perjured testimony or false evidence, see *DR* 7–102(A)(4), (5) & (6), until he is actually ordered to begin the preparation. This narrow view of an employee's duty to obey codes of ethics does little to promote such clear mandates of public policy. It will allow unscrupulous employers to forestall discussion on proposed unethical conduct, and to evade the spirit of the majority's new principle by carefully timing such conduct to prevent meaningful dissent. Thus, the majority's additional requirement that proposed conduct be imminent is both unnecessary and self-defeating. I would hold that defendant has not eliminated "all genuine disputes as to any material facts" under the majority's principle that an employee may not be discharged for opposing conduct in violation of a "clear mandate of public policy." I would therefore affirm the denial of summary judgment on plaintiff's tort claim.

Plaintiff asserts a contract claim as well as a cause of action sounding in tort. See *ante* at 64. The majority dismisses the contract claim by presuming that plaintiff was an employee at will. See *ante* at 61, 62 & 71–72. Although stated as an undisputed fact, the proposition is an inference based on the absence of evidence of a contrary agreement. See *English v. College of Medicine and Dentistry of New Jersey*, 73 *N.J.* 20, 23 (1977); *Jorgensen v. Pennsylvania R.R. Co.*, 25 *N.J.* 541, 554 (1958); *Schlenk v. Lehigh Valley R.R. Co.*, 1 *N.J.* 131, 135 (1948); see generally 53 *Am.Jur.2d*, Master and Servant § 43 at 117–118 (1970); 56 *C.J.S.* Master and Servant § 31 at p. 412–413 (1948). Yet the majority's discussion says nothing about the presence or absence of a genuine dispute as to the existence of a contrary agreement. Such a dispute presently exists. Not only may principles of public policy—the very principles the majority espouses—be implied as part of an employment agreement as a matter of law, see *Vasquez v. Glassboro Service Assoc., Inc.*, 83 *N.J.* 86, 90, 98 (1980); *Nicoletta v. North Jersey Dist. Water Supply Comm'n*, 77 *N.J.* 145, 179–180 (1978) (Pashman, J., concurring), but unexpressed terms arising from the relationship

between the parties or the purposes of the agreement may also impliedly be a part of a particular contract, see, *e.g.*, *New Jersey Bank v. Palladino*, 77 *N.J.* 33, 46 (1978); *Palisades Properties, Inc. v. Brunetti*, 44 *N.J.* 117, 130 (1965); *Tessmar v. Grosner*, 23 *N.J.* 193, 201 (1957). By asserting a contractual claim, plaintiff alleges that the relationship between a doctor, a trained and ethically motivated professional, and the pharmaceutical company that employs her creates implied contractual terms. According to those terms, the drug company shall not fire the doctor for the good faith exercise of her informed judgment on matters of professional ethics. Plaintiff's claim of a contract implied in fact has not been refuted or even directly challenged by defendant or the majority.

The unexplained conclusion that plaintiff was an employee at will, see *ante* at 61, cannot substitute for a detailed examination of the factual basis for plaintiff's cause of action for breach of contract. Nor does the majority's passing observation that plaintiff "did not assert the breach of any specific contractual provision," *ante* at 73, amount to such careful scrutiny. The lack of a written employment agreement makes the absence of "any specific contractual provision" unremarkable. The genuine issue not discussed by the majority is whether plaintiff enjoyed a contractual privilege to express her ethical views despite the absence of any pertinent writing. The resolution of this issue may lie outside any formal contractual term. See 3A A. Corbin, *Contracts* § 684 at 224 (1960). However, the majority demands a written guarantee of job security where none of the terms of her employment, save a secrecy agreement, was reduced to writing. This "unaccountable" requirement, see *ante* at 73, cannot serve "to exclude any reasonable doubt as to the existence of any genuine issue," *Judson, supra*, 17 *N.J.* at 74, respecting plaintiff's contract claim. I would affirm the denial of summary judgment for defendant as to this claim as well.

The majority states that generally it should not resolve disputes involving far-reaching issues of public policy on a motion for summary judgment. *Ante* at 65; see *Salorio v. Glaser*, 82 *N.J.* 482, 517 (1980), app. docketed, 49 *U.S.L.W.* 3005 (U.S. June 23, 1980) (No. 79–2026); *Jackson v. Muhlenberg*

*Hospital*, 53 *N.J.* 138, 142 (1969); *Lusardi v. Curtis Point Prop. Owners Ass'n*, 138 *N.J.Super.* 44, 51 (App.Div. 1975); *Bennett v. T & F Distributing Co.*, 117 *N.J.Super.* 439, 445–446 (App.Div. 1971), certif. den., 60 *N.J.* 350 (1972). Yet the majority today has ignored this sound principle of judicial administration. It compounds its error by refusing to apply meaningfully its substantive ruling to the case prompting it. Instead, the majority has prevented the plaintiff from proving at trial that her discharge was based on a refusal to engage in a clear violation of statutory policy or one of several codes of professional ethics. It also rejects plaintiff's contractual allegations without any examination of their possible factual basis, let alone an examination that is properly "indulgent." While I generally agree with the legal principles expressed in the majority's decision, I cannot accept its grudging and inconsistent application of them. Plaintiff has been denied the benefit of the rule which she has sought to vindicate her professional conscience. Since I would permit her that benefit, I respectfully dissent.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices SULLIVAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—6.

*For affirmance*—Justice PASHMAN—1.