961 A.2d 1167

MARIA TARTAGLIA, PLAINTIFF–RESPONDENT AND CROSS–AP-
PELLANT, v. UBS PAINEWEBBER INCORPORATED AND
HERBERT JANICK, DEFENDANTS–APPELLANTS AND
CROSS–RESPONDENTS.

Argued October 10, 2007—Decided December 16, 2008.

82

84

*Ronald M. Green,* a member of the New York bar, argued the cause for appellants and cross-respondents (*Epstein Becker & Green,* attorneys; *Mr. Green, Barry L. Asen* and *Michael R. DiChiara,* of counsel; *Mr. Green, Mr. DiChiara* and *Susan Gross Sholinsky,* on the briefs).

*Fredric J. Gross* argued the cause for respondent and cross-appellant (*Mr. Gross,* attorney; *Susan E. Babb,* of counsel).

Justice HOENS delivered the opinion of the Court.

These cross-petitions for certification call upon this Court to address four issues relating to the trial and verdict on plaintiff Maria Tartaglia's wrongful termination and sexual harassment

complaint. Defendants, UBS PaineWebber Inc. (PW) and Herbert Janick, ask us to overturn the Appellate Division's judgment granting a new trial, arguing that the Appellate Division made three different errors in reaching its decision. First, defendants argue that the panel erred in concluding that plaintiff should have been given the benefit of an adverse inference charge relating to allegedly spoliated evidence in light of the fact that she had also been permitted to assert and preserve separate, substantive spoliation claims. Second, defendants assert that the Appellate Division erred in overturning the trial court's determination that certain evidence offered by plaintiff could not be used by the jury to demonstrate that plaintiff had engaged in protected activity. Third, defendants argue that the appellate panel erred in its evaluation of the propriety of two comments made by defense counsel in summation. Plaintiff, in her cross-petition, asks us to overturn the pre-trial order, affirmed by the Appellate Division, that granted summary judgment to defendants on her common law wrongful termination claim. We affirm in part, reverse in part, and remand.

I.

As is frequently true in employment discrimination claims, our evaluation of the issues can only be understood in the context of the specific facts in dispute. Plaintiff is an attorney. In August 1992, when plaintiff was hired to work as a Staff Attorney in PW's Regulatory Group, she had about five years of experience working in the securities field, both at the New York Stock Exchange and in the legal department at Prudential–Bache (Prudential). During the course of her employment at Prudential, plaintiff experienced severe depression, and she was criticized both for her work and for failing to keep up her personal appearance. Prudential had terminated plaintiff from that job.

Approximately a year after plaintiff started working at PW, a new general counsel was hired, and the entire Legal Department was reorganized. As a part of that reorganization, in November

1993, PW hired Janick, a former employee of the Securities and Exchange Commission (SEC), to be its Senior Associate General Counsel. In that position, Janick's responsibilities included developing, building, and overseeing the PW Regulatory Group. About six months after Janick arrived, Eric Seltzer, who was also a former SEC employee, joined PW as an Associate General Counsel and became plaintiff's supervisor. Seltzer was responsible for supervising regulatory requests and managing the attorneys' and paralegals' responses to requests that were made to the Regulatory Group.

In July 1994, Seltzer evaluated plaintiff's performance. He rated plaintiff's legal skills, problem solving, and judgment as "excellent," and her business knowledge, productivity, and client relation skills as "outstanding." His written evaluation also included positive comments about plaintiff's management of the paralegals in the department. Seltzer found, however, that plaintiff needed improvement in two areas. Specifically, he noted that she needed to improve her skills in dealing with "difficult" regulators so as to avoid exacerbating problems and that the completion of her assignments was not always "as timely as [it] could have been."

Because of Seltzer's concern about the adverse effect that plaintiff's contentious interactions with regulators could have on PW and its clients, he stopped assigning her to the cases that were likely to lead to such confrontations. Instead, Seltzer assigned plaintiff to be the manager of the newly-created Preliminary Inquiry Unit, where she managed paralegals to ensure that they met document production deadlines on more routine matters.

Seltzer's 1994 year-end performance evaluation of plaintiff was less favorable than the earlier one. Most of plaintiff's performance rankings indicated either that she met the applicable standards or that her performance was "above normal" according to those standards. Seltzer observed that "[o]n the whole her written submissions are acceptable, although in a few instances they have lacked needed analysis." He also included positive com-

ments, noting that plaintiff was well versed with the way in which PW operated and its many regulatory responsibilities, and that "[h]er contacts within the firm have been of great benefit to the group." However, Seltzer criticized plaintiff's judgment, reporting that she "has, at times, lost her temper and objectivity which has resulted in her being unable to communicate with regulators." He also continued to criticize plaintiff's work habits, noting that "[g]enerally, her timeliness has not been good as she arrives late to work often."

After that evaluation, plaintiff asked to be moved from the Regulatory Group into the Counseling Group. Although she made no complaint of any kind about Seltzer as a basis for her request, at trial plaintiff testified that she asked to be transferred because Seltzer was beginning to "act oddly toward [her]" and she was starting to feel uncomfortable. Plaintiff's request was granted, and she began to serve as Backup Division Counsel in the Counseling Group, supervising work related to subpoenas, garnishments, and levies.

### A.

Plaintiff's sexual discrimination and retaliation claim rests on two incidents involving Seltzer. The first of these, which the parties refer to as the "wedding remark," occurred shortly after plaintiff was transferred to the Counseling Group. In June 1995, plaintiff, accompanied by her boyfriend, attended a co-worker's wedding reception. According to plaintiff, when she introduced her boyfriend to her co-workers, Seltzer said to him, "Everyone at the table with a cock used to have Maria reporting to him." At trial, plaintiff and her boyfriend both testified as to the substance of the remark and that they were shocked by it.

Plaintiff did not complain immediately to anyone at PW about Seltzer's comment. She did, however, meet with Dr. Robert McMullen, a psycho-pharmacologist, because she was feeling anxious and upset and was having trouble sleeping. She asked Dr.

McMullen for medication so that she would be able to work. He eventually diagnosed plaintiff as suffering from bipolar disorder.

The second statement on which plaintiff based this claim has been referred to by the parties as the "wet my pants" comment. This incident occurred three months later at a Legal Department function when, by mistake, plaintiff introduced herself as still working in the Regulatory Group. According to plaintiff, a couple of days later, when she and another employee were at a meeting with Janick, Seltzer walked into the office and "quite loudly" stated that he nearly "wet [his] pants" when he heard plaintiff identify herself as being part of the Regulatory Group. Plaintiff testified that Janick laughed at Seltzer's comment and that she felt "humiliated and helpless."

In September 1995, immediately following the incident in Janick's office, plaintiff complained to Donna Yanez, who worked in PW's Human Resources Department (HR), about Seltzer. In her verbal complaint, plaintiff told Yanez about the "wedding remark" and the "wet my pants" comment and said that Seltzer was subjecting her to daily verbal harassment. Plaintiff expressed concern that Seltzer's attitude toward her might have affected his evaluations of her or his description of her work to Janick. She also complained about Janick because he had laughed in response to the "wet my pants" remark. Finally, plaintiff told Yanez that she was trying to deal with these issues through medication and that she felt that she was going to have a nervous breakdown.

The HR Department, through Yanez, quickly investigated. Seltzer was called to Janick's office, where Yanez informed him about plaintiff's complaint. Seltzer denied making the "wedding remark," calling that allegation "an outrageous lie," and saying he was shocked to hear it. Seltzer did, however, acknowledge that he had made a comment in Janick's office. Although Seltzer offered to tell plaintiff that he was sorry that she was upset, he was directed not to do so. Yanez continued her investigation, but when she spoke to other employees who were at the wedding table, she learned that none of them had heard the remark

plaintiff attributed to Seltzer. Yanez and Janick therefore concluded that plaintiff had misheard whatever had been said.

According to plaintiff, a few days after she made her complaint, Yanez informed her that it had been investigated and that Seltzer had admitted to being upset that plaintiff had transferred out of his group, leaving him with work that she had not completed. When Yanez told plaintiff that both Seltzer and Janick had offered to apologize to her, plaintiff said that she just "want[ed] to be left alone." Plaintiff concedes that after Yanez intervened, Seltzer immediately stopped all of the behaviors that she had complained about.

## B.

Plaintiff's wrongful termination count was based on a different series of events that occurred beginning in late 1996, when Garry Stegeland became plaintiff's supervisor in the Counseling Group. Shortly after Stegeland's arrival, plaintiff was directed to devote the majority of her time to the Municipality Group, where she was assigned to the Municipality Project. After plaintiff was assigned, PW increased the scope of that project and hired more attorneys for the group, in part because of a memo written by plaintiff. With Janick's approval, Stegeland made plaintiff the supervisor of the Municipality Group, giving her responsibility over all of the attorneys assigned to it. In June 1997, Stegeland gave plaintiff a favorable mid-year performance review. According to Stegeland, however, plaintiff's performance immediately began to decline, and he spoke to her several times because the work was not moving along quickly enough.

A few months later, Stegeland told plaintiff that the Municipality Project should be brought to an end by late 1997 or early 1998. He also informed her that when the project ended, she would have to look for another position either within or outside of PW. Plaintiff testified that although she had not been told previously that she would have to search for other work when the project ended, she was not concerned because positions in the Legal

Department opened up regularly. Eventually, however, Stegeland told her that he did not think that there would be another position for her at PW.

Plaintiff contends that she was astonished to learn this and that she met with Janick to tell him that she wanted to be reassigned to another project or position. Janick, in turn, told plaintiff that he did not consider her to be one of the most talented attorneys in the department. According to plaintiff, this news caused her to resume taking medication, which she had stopped using several months earlier.

In early 1998, plaintiff contacted Francine Franklin, the manager of the Early Dispute Resolution (EDR) Unit, to inquire about a position that had opened up in that section. Franklin told plaintiff that she did not think it would be a position that plaintiff would want because plaintiff was more senior than the other attorneys and would find it boring. Franklin also told plaintiff that she did not have the appropriate temperament for the position. In spite of these misgivings, Franklin agreed to speak to her supervisor, Tracy Calder. When she did so, Calder expressed similar concerns about plaintiff's suitability for the position.

Plaintiff, however, asked Janick to intervene, and Janick spoke with Calder about moving plaintiff into the EDR Unit. When Calder expressed her concern about plaintiff's temperament, Janick told her to give plaintiff a chance anyway. Because of the concerns that had been expressed, however, Janick told plaintiff that she would be transferred to the EDR Unit for a ninety-day probationary period and that she would have to meet with her managers on a bi-weekly basis so that they could monitor her performance and provide her with feedback.

Janick admitted that he had never before given an attorney a new assignment on a trial basis and that newly-hired attorneys did not have a probationary period. He testified that he believed it was appropriate, in part because there were no other open positions in the division and the two other attorneys who had been

employed in the Municipality Project had to leave the company. If Janick had not intervened, plaintiff also would have lost her job.

On March 2, 1998, plaintiff started work with the EDR Unit, where she reported to Franklin, who, in turn, reported to Calder. In her new role, plaintiff was responsible for investigating customer complaints involving PW's Financial Advisors (FAs) in order to address their concerns. The next day, plaintiff told Franklin that she thought it might be a conflict of interest for her to represent both PW and the individual FAs in response to a customer complaint. She asserted that the department should be giving the FAs written, rather than oral, notification about the potential conflict of interest.

Franklin told plaintiff that the EDR Unit did not use conflict letters, but promised to take plaintiff's concern to Calder. Calder did not agree that a conflict of interest letter was needed and concluded that verbal notice to the FAs sufficed. Nevertheless, Calder gave plaintiff permission to research the matter on her own time if she so desired. Rather than doing so, plaintiff took her argument to Joel Davidson, the attorney who had first brought her into PW, but whose position was outside of the departmental chain of command. Davidson thought that in some circumstances, a conflict letter would be appropriate.

Separate and apart from the debate about verbal or written notice of potential conflicts of interest, an issue quickly arose about plaintiff's work schedule. Shortly after plaintiff started in the EDR Unit, Franklin wanted to schedule an 8:30 a.m. meeting. Plaintiff told Franklin that she could not get up early enough to arrive at work before 9:30 a.m. or 10:00 a.m. because she was taking an antidepressant medication to treat her bipolar condition. Plaintiff also told Franklin that Stegeland, her former supervisor in the Counseling Group, had agreed to her informal request for this accommodation. Franklin had not been aware of any request or arrangement, but she agreed to follow up on it.

HR then immediately began to address plaintiff's accommodation request. Barbara Bubko, an HR employee, contacted plain-

tiff and explained that PW's standard procedure required plaintiff to sign a release so that PW's medical advisor could discuss the accommodation request with plaintiff's physician. Plaintiff was concerned about signing a release and asked for an opportunity to speak to her attorney. Plaintiff also asked whether, instead of signing a release, she could submit a note from her doctor. Bubko agreed, but plaintiff never provided a note from her doctor and never signed a release. She did, however, continue to arrive late.

While the conflicts debate and the accommodation discussion were going on, Calder and Franklin were meeting regularly with plaintiff about her performance. During their first meeting, two weeks after plaintiff had started, they told her that they already had two concerns. First, Franklin said that in light of plaintiff's experience, they expected she would have a faster "start-up" with the cases assigned to her. Plaintiff responded by complaining about her salary, which Calder told her to address with Janick.

Second, Franklin told plaintiff that she was spending too much time working on the conflicts issue, which Franklin believed had already been resolved, rather than on doing her work. Plaintiff protested, arguing that she felt strongly about the issue and did not agree with Franklin's substantive views. Calder explained that if plaintiff felt strongly, she could prepare a memo for Janick, but that she needed to do it on her own time.

Two days later, at plaintiff's urging, Janick called a meeting with Franklin, Calder, and plaintiff regarding the conflicts letter dispute. According to Calder, the outcome of the meeting was that the "firm [had] made a decision that [they] were going to give [the conflicts] information orally, and if there was a specific instance where [they] believed that someone did not understand it or needed further information on it, [they] would deal with those as they came up." Calder apparently was also upset that plaintiff had gone outside of the chain of command in pursuing this issue.

On March 25, 1998, at plaintiff's second bi-weekly status meeting, Franklin and Calder again expressed concern that plaintiff was not moving her cases and that plaintiff's specific assurances

about how she intended to close out some of her cases had gone unfulfilled. Two weeks later, on April 9, 1998, plaintiff met with Franklin and Calder for another status meeting, and they again voiced their concerns about plaintiff's inability to handle her caseload. The meeting became argumentative, and plaintiff told Franklin and Calder that she did not have to update them on the status of her work and that she did not need to tell them when she could not meet a deadline to which she had agreed. Because Calder regarded plaintiff's attitude to be insubordinate and unproductive, she ended the meeting and instructed plaintiff to go over her caseload with Franklin the following Monday.

Immediately following the April 9 status meeting, Calder spoke to Janick about plaintiff's poor work performance and attitude. Janick agreed with Calder that plaintiff should be terminated, but he told Calder that he would not tell plaintiff until Monday, April 13, because the firm would be closed on Friday, April 10, for a holiday.

At about the same time, Franklin approached plaintiff and they agreed to go over her caseload that day rather than wait until Monday. According to Franklin, at some point during their discussion, plaintiff asked, "What does it matter? I'm going to be fired anyway." After the meeting with Franklin, plaintiff also expressed concern to two of her co-workers that she was going to be fired. Plaintiff then contacted her doctor to ask about whether she could seek a disability leave.

Plaintiff did not return to work on Monday, April 13. Instead, she called Franklin and advised her that she was "going out on disability as per [her] doctor's recommendation." Franklin explained that she would need to contact HR about such a request. Shortly thereafter, Bubko called plaintiff and told her about the forms that she would need to submit in order to request a disability leave. Neither Franklin nor Bubko indicated to plaintiff that she had been terminated.

On the same day, however, Franklin sent plaintiff a termination letter which stated in relevant part:

[Y]our advice to me this morning that you will be taking a disability leave of absence follows management's decision on your termination. It is my further belief that our decision to inform you today of your termination should not have come as a surprise, given your comments to me during our second meeting on Thursday, April 9, in which you stated to me that you expected that you would be terminated.

At this point, while we will be terminating your employment, we will postpone a decision on the actual termination date until such time as your benefits claim has been timely received and reviewed by the appropriate parties.

Plaintiff believed that the firm could not terminate her because she had already notified the firm that she "placed herself" on disability. Eventually, however, plaintiff's disability application was denied because, according to PW, the claim only arose after she had been terminated.

In June 1998, approximately two months after her termination, plaintiff found new employment. She left that position a year later, claiming that she was suffering from panic attacks related to her experience at PW that made it difficult for her to function.

## II.

Plaintiff filed her four count complaint in 1999, naming PW and Janick as defendants. First, plaintiff asserted that she had been wrongfully discharged from her employment because of the complaints she had raised about the conflict of interest issue, in violation of her common law wrongful discharge rights. *See Pierce v. Ortho Pharm. Corp.*, 84 *N.J.* 58, 417 *A.*2d 505 (1980). Second, plaintiff alleged that she had been discriminated against during her time at PW and in her discharge from that employment based on her medical condition. Third, plaintiff contended that she had been subjected to retaliation because of her 1995 harassment complaints against Seltzer. Finally, plaintiff included a breach of contract claim based on PW's failure to approve her application for disability benefits. During the pendency of the litigation, the court permitted plaintiff to add two further counts to her complaint. Those counts, seeking relief based on theories of negligent destruction of evidence and fraudulent concealment of evidence, were bifurcated.

Plaintiff voluntarily dismissed the breach of contract claim shortly after the complaint was filed, electing to proceed instead on the retaliatory discharge, discrimination, and spoliation claims alone. In 2003, the trial court granted summary judgment in favor of defendants on plaintiff's common law retaliatory discharge claim. In so ruling, the court agreed with defendants that, in order to prevail on a *Pierce* claim, an employee must demonstrate that he or she actually notified an outside agency about the allegedly wrongful conduct of the employer. Because plaintiff conceded that she did not voice her complaint about PW's refusal to utilize a written conflicts letter to an entity or person other than PW itself, the trial court concluded that she could not prevail on that claim.

On March 1, 2004, following a lengthy trial, the jury returned a verdict in defendants' favor on plaintiff's remaining substantive claims for relief. In particular, the jury found that plaintiff had not proven by a preponderance of the evidence that PW terminated her either because of her asserted medical disability or in retaliation for having participated in protected activity. After the jury returned its verdict, the parties presented brief summations to the same jury on the bifurcated spoliation claims. While the jury was deliberating, the parties reached a settlement on those counts, specifically preserving plaintiff's right to seek appellate review of all other issues.

In an unpublished opinion, the Appellate Division affirmed the pre-trial order granting partial summary judgment in favor of defendants on plaintiff's *Pierce* claim, but reversed the judgment based on the jury verdict and ordered that the other substantive counts be tried anew.

In its consideration of the *Pierce* claim, the Appellate Division agreed with the trial court that plaintiff's failure to notify an outside authority about her complaint that the company was violating the conflict of interest rules was fatal to her common law retaliatory discharge claim. In so holding, the appellate panel concluded that an employee's expression of concern internally to

other corporate executives is insufficient to sustain a recovery under the *Pierce* doctrine. *See House v. Carter–Wallace, Inc.,* 232 *N.J.Super.* 42, 49–51, 556 *A.*2d 353 (App.Div.), *certif. denied,* 117 *N.J.* 154, 564 *A.*2d 874 (1989).

The panel concluded, however, that plaintiff was entitled to a new trial on the other substantive claims, finding three significant errors. First, the panel determined that it was error to refuse plaintiff's request for an adverse inference charge based on missing documents relating to her disability and retaliation claims that were also the subject of the bifurcated spoliation claims. The court explained that "there was a factual dispute as to whether these documents actually existed at the time a duty of preservation arose and, if so, if they were intentionally destroyed in anticipation of litigation." In part, the panel's evaluation relied on its analysis of evidence offered at trial tending to demonstrate that the disputed documents had existed and whether defendants had a duty to preserve documents following plaintiff's statement to Bubko that her attorney would be contacting the company. Based on that review, the panel concluded that the trial court erred in determining that there was no evidence that material documents had been destroyed. Although there was a factual dispute about whether the particular documents plaintiff requested had ever existed and about whether documents were intentionally destroyed, the appellate panel concluded that plaintiff was entitled to an adverse inference charge.

Second, the panel determined that the trial court erred by limiting the evidence that the jury could consider in evaluating plaintiff's retaliation claim. The trial court had instructed the jury that only plaintiff's complaint about Seltzer's "wedding remark" was protected activity for purposes of that claim, reasoning that the "wet my pants" remark was "non-sexual" in nature. The Appellate Division disagreed, concluding that conduct need not be overtly sexual in order to constitute sexual harassment, and noting that if the comment was made because of plaintiff's gender, her complaint about it would be protected activity as well. Describing

this as presenting a "classic jury question," the panel determined that the trial court erred in preventing the jury from considering it.

Third, the panel agreed with plaintiff that two aspects of the closing argument offered on behalf of defendants were unduly prejudicial and, although not so egregious that they would alone support a new trial, were worthy of correction in light of the other grounds for reversal.

Defendants petitioned this Court for certification of each of the issues that formed the basis for the Appellate Division's reversal of the judgment in their favor. Plaintiff cross-petitioned for certification of the Appellate Division's judgment affirming the dismissal of her *Pierce* claim. We granted both the petition and cross-petition. 190 *N.J.* 256, 919 *A.*2d 849 (2007).

### III.

This Court first recognized a common law cause of action for retaliatory discharge when we decided *Pierce* in 1980. *See Pierce, supra,* 84 *N.J.* at 72, 417 *A.*2d 505. We there held that "an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy." *Ibid.* We further identified the rationale that supported our recognition of this cause of action, explaining: "[a]n employer's right to discharge an employee at will carries a correlative duty not to discharge an employee who declines to perform an act that would require a violation of a clear mandate of public policy." *Ibid.* We stated:

> In recognizing a cause of action to provide a remedy for employees who are wrongfully discharged, we must balance the interest of the employee, the employer, and the public. Employees have an interest in knowing they will not be discharged for exercising their legal rights. Employers have an interest in knowing they can run their businesses as they see fit as long as their conduct is consistent with public policy. The public has an interest in employment stability and in discouraging frivolous lawsuits by dissatisfied employees.
>
> [*Id.* at 71, 417 *A.*2d 505.]

We did not fully delineate the proofs needed to sustain a cause of action in *Pierce,* and found, based on the facts before the Court in that matter, that Dr. Pierce herself could not prevail. *Id.* at 75–76, 417 *A.*2d 505.

A few years later, the Legislature enacted the Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19–1 to –8, effectively creating a statutory cause of action for retaliatory discharge. In doing so, however, the Legislature did not entirely supplant *Pierce.* Instead, the Legislature recognized the continuing viability of the common law cause of action as an alternate form of relief, but included a statutory provision that deems the filing of a CEPA complaint to be an election of remedies. *N.J.S.A.* 34:19–8; *see, e.g., Catalane v. Gilian Instrument Corp.,* 271 *N.J.Super.* 476, 638 *A.*2d 1341 (App.Div.), *certif. denied,* 136 *N.J.* 298, 642 *A.*2d 1006 (1994). Since CEPA was enacted, the common law remedy recognized in *Pierce* has continued to exist side by side with the statutory one. Although the available remedies and statutes of limitation applicable to the two causes of action are different, and although the CEPA requirement of an election precludes any plaintiff from proceeding on both theories simultaneously, the two avenues for relief are harmonious.

Two aspects of the *Pierce* cause of action are significant to this appeal; namely, whether plaintiff's purely internal complaint about the asserted violation of the Rule of Professional Conduct (RPC) relating to conflicts of interest [1] is sufficient to support her claim and, if so, whether the RPC about which she complained qualifies as a "clear mandate of public policy" for *Pierce* purposes. In answering the first question, we begin by considering whether

---

[1] Plaintiff's complaint, and the record before us, is ambiguous about which of the RPCs she thought were being violated by PW. In her brief, she referred to several, including two that relate to corporate representation generally, RPC 1.13(a) and RPC 1.13(d), and another, RPC 4.3, which relates to communications with unrepresented employees. Although the sparse record is not definitive, the substance of plaintiff's assertion leads us to conclude that she may have been referring to RPC 1.7(b), relating to concurrent representation.

an actual complaint to an outside agency is required to support the common law cause of action.

■ Plaintiff argues that both the trial court and the appellate panel erred by applying language in this Court's decision in *Young v. Schering Corp.*, 141 *N.J.* 16, 660 *A.2d* 1153 (1995), that would require such a complaint. She asserts that her *Pierce* claim should not have been dismissed because the language in *Young* describing a complaint to an outside agency as a prerequisite was dicta and that it has been essentially disavowed by this Court. In particular, plaintiff argues that our decisions, both in announcing and in applying the *Pierce* doctrine, have not included a requirement that a complaint be made to an outside authority, instead permitting an employee to prevail if he or she points to a clear mandate of public policy about which he or she complained. *See Hennessey v. Coastal Eagle Point Oil Co.*, 129 *N.J.* 81, 92, 609 *A.2d* 11 (1992); *cf. Velantzas v. Colgate–Palmolive Co.*, 109 *N.J.* 189, 192–93, 536 *A.2d* 237 (1988). Defendants argue that the trial court and the Appellate Division were correct in relying on *Young* and on the Appellate Division's similar explanation of the *Pierce* doctrine in *House, supra*, 232 *N.J.Super.* at 48–49, 556 *A.2d* 353, for the conclusion that plaintiff's *Pierce* claim could not survive because she concedes that she made no complaint to an outside entity.

Our decision requires that we consider the essential underpinnings of the *Pierce* doctrine. Seen in its historical context, *Pierce* created an avenue for an at-will employee, who otherwise had little, if any, means of redress for termination, to assert that his or her discharge was wrongful. At the time, an employee could, pursuant to the New Jersey Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –49, and similar statutes, *see* Civil Rights Act of 1964, 42 *U.S.C.* §§ 2000e to 2000e–17; Age Discrimination in Employment Act of 1967, 29 *U.S.C.* §§ 621–634, seek relief for a discharge that was based on discrimination. In *Pierce*, however, the plaintiff had no basis for a discrimination claim; she had resigned because she believed that her employer was engaged in

research that she, in good conscience, could not support. We viewed her claim as being in the nature of constructive discharge and considered whether there were circumstances, apart from claims based on discrimination, in which termination of an at-will employee could be wrongful.

Balancing the unquestionably broad rights of employers to fire employees against the public's interest in maintaining a stable workforce, we concluded that some non-discriminatory firings were nevertheless actionable. We drew the line in favor of employees who could demonstrate that their termination was "contrary to a clear mandate of public policy." *Pierce, supra,* 84 *N.J.* at 72, 417 *A.*2d 505. Even so, Pierce herself could not meet that test, because she had voiced a disagreement with her employer's medical research based on her belief that the formula for its pharmaceutical product contained an ingredient that was "controversial." In part, because human testing of the disputed drugs required FDA approval and because that process created an appropriate mechanism for safeguarding the public, we found no clear violation of public policy in Pierce's entirely internal disagreement with other research professionals. *Id.* at 74–76, 417 *A.*2d 505. The focus in *Pierce,* therefore, was on the existence of a clear mandate of public policy, and not on the manner in which the employee voiced her objection to what the employer was doing.

When CEPA was enacted, it supplanted much of the focus on *Pierce* because it addressed the then-novel circumstances surrounding corporate whistle-blowers and created a statutory cause of action for any at-will employee who had been fired for engaging in that activity. Although CEPA itself makes clear that common law rights are not extinguished, *see N.J.S.A.* 34:19–8 (waiver and election of remedies); *Young, supra,* 141 *N.J.* at 27, 660 *A.*2d 1153 (concluding that parallel claims would be duplicative); *Maw v. Advanced Clinical Commc'ns, Inc.,* 359 *N.J.Super.* 420, 440–41, 820 *A.*2d 105 (App.Div.2003) (acknowledging that a plaintiff may elect either a common law or CEPA claim), *rev'd on other grounds,* 179 *N.J.* 439, 846 *A.*2d 604 (2004), it includes significant

requirements that, as a practical matter, serve to limit its availability. *See, e.g., N.J.S.A.* 34:19–5 (imposing one year statute of limitations).

In large measure, the statutory and common law causes of action are similar, and the statutory language overlaps the *Pierce* articulation of the basis for the common law remedy. *Compare N.J.S.A.* 34:19–3(c) (identifying basis for CEPA cause of action as employee's "reasonabl[e] belie[f]" that employer's act "is in violation of a law, or a rule or regulation promulgated pursuant to law[,] . . . is fraudulent or criminal[, or] . . . is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment") *with Pierce, supra,* 84 *N.J.* at 72, 417 *A.*2d 505 (referring to the alleged violation of "a clear mandate of public policy").

■ Although we have considered the parameters of the "clear mandate of public policy" needed to support a *Pierce* claim on several occasions, we have never directly addressed the question of the nature of the complaint by the employee that is required to support the *Pierce* common law cause of action. The statutory claim recognized in CEPA specifically refers to notification, or threatened notification, to an outside agency or supervisor, *see N.J.S.A.* 34:19–3(a); *see, e.g., Mehlman v. Mobil Oil Corp.,* 153 *N.J.* 163, 707 *A.*2d 1000 (1998), and also permits a claim to be supported by evidence that the employee objected to or refused to participate in the employer's conduct, *see N.J.S.A.* 34:19–3(c). The question is whether the *Pierce* claim requires more.

In addressing *Pierce,* we have concluded that an employee who was terminated after asking to see her personnel file as a prelude to filing a discrimination complaint had identified a clear mandate of public policy. *See Velantzas, supra,* 109 *N.J.* at 191, 536 *A.*2d 237. We did not require that she also demonstrate that she had complained about any of the employer's acts either internally or to an outside entity because the gravamen of her claim was that she was terminated in order to prevent her from exercising her right to file a complaint. *Id.* at 192–93, 536 *A.*2d 237. On the other

hand, we have found no violation of a clear mandate of public policy in the discharge of an oil company employee who refused to provide urine samples for drug testing based on his belief that it violated his right to privacy. *Hennessey, supra,* 129 *N.J.* at 88, 609 *A.2d* 11. Our analysis did not turn on whether or not the employee had raised an objection, but related only to balancing the significant public policy considerations that bore on the drug-testing policy itself. *Id.* at 100–01, 609 *A.2d* 11. Similarly, in the years following *Pierce,* both our Appellate Division, *see Kalman v. Grand Union Co.,* 183 *N.J.Super.* 153, 155–59, 443 *A.2d* 728 (App.Div.1982), and the federal appellate court, *see Radwan v. Beecham Labs.,* 850 *F.2d* 147, 148–49 (3d Cir.1988), analyzed the sufficiency of common law retaliatory discharge claims irrespective of any evidence that the employee made a complaint to an outside agency.

The Appellate Division, however, in *House, supra,* 232 *N.J.Super.* at 48–49, 556 *A.2d* 353, suggested that the nature of the complaint, and the manner in which it was voiced, were relevant to the inquiry in rejecting a terminated employee's *Pierce* claim. Although the employee in *House* could not point to any violation of a mandate of public policy, the appellate panel also found that a purely internal complaint could not support a recovery. In considering that aspect of the matter, the Appellate Division concluded that if an employee finds a corporate policy to be objectionable, the employee must either bring his or her complaint to an outside authority or "take other effective action in opposition to the policy." *House, supra,* 232 *N.J.Super.* at 49, 556 *A.2d* 353. In further referring to "other effective action," the Appellate Division described it as "other action reasonably calculated to prevent the objectionable conduct." *Ibid.* We have not, since that time, addressed the question of the nature of the complaint that *Pierce* requires or whether the *House* analysis is in accord with that common law remedy.

Nor did we do so in *Young.* There, we were confronted with a complaint that had been litigated squarely within the parameters

of CEPA and in which the plaintiff asserted that he could also make a claim under *Pierce* if his CEPA proofs fell short. *Young, supra,* 141 *N.J.* at 27, 660 *A.*2d 1153. The`issue, then, was only whether, in light of the CEPA requirement of an election of remedies, filing a CEPA complaint effectively supplanted a *Pierce* remedy. *Ibid.* In our discussion of the two remedies, we commented that the former demanded only "notification or threatened notification to a public body or a supervisor," while the latter required "actual notification to a governmental body." *Ibid.* Because the question presented in *Young* did not demand any substantive *Pierce* analysis, however, the distinction between those remedies that we purported to draw about notification was dicta.

■ Since we decided *Young,* however, we have not followed that dicta, and, most recently, we expressed our reluctance to consider the failure to make a complaint to an outside agency to be a sound requirement for a *Pierce* claim. *Mehlman, supra,* 153 *N.J.* at 181–82, 707 *A.*2d 1000. To be sure, a *Pierce* claim will often include an employee's complaint about an employer's action to an external authority because a discharge in those circumstances will more likely support the claim that his or her termination violates a clear mandate of public policy. Nothing in *Pierce,* however, mandates an actual or even a threatened external complaint as an element of the cause of action. *See, e.g., Velantzas, supra,* 109 *N.J.* at 191, 536 *A.*2d 237.

Seen in this light, the Appellate Division's decision in *House* is entirely consistent with our decision in *Pierce.* The plaintiff's claim in *House* fell short not only because he voiced his complaint internally to relatively junior level executives, but because he had no real basis for his assertion that the company's product was contaminated. *House, supra,* 232 *N.J.Super.* at 51–52, 556 *A.*2d 353. More to the point, the decision points to the need for an external complaint only in the alternative, noting that "other action reasonably calculated to prevent the objectionable conduct" may suffice. *Id.* at 49, 556 *A.*2d 353. That analysis, however,

comports with *Pierce* by ensuring that the evidence be sufficient to support the conclusion that a termination violates a public policy mandate.

■ Even though we do not require that an external complaint be made to support a *Pierce* claim, the remedy is not unbounded. Like the CEPA remedy to which it gave rise, it requires in this context an expression by the employee of a disagreement with a corporate policy, directive, or decision based on a clear mandate of public policy derived from one of the sources we identified in *Pierce*. It requires, as well, a sufficient expression of that disagreement to support the conclusion that the resulting discharge violates the mandate of public policy and is wrongful. That is to say, a complaint to an outside agency will ordinarily be a sufficient means of expression, but a passing remark to co-workers will not. A direct complaint to senior corporate management would likely suffice, but a complaint to an immediate supervisor generally would not.

■ We do not intend to suggest that we will elevate an employee's expression of purely personal viewpoints to a level that will preclude termination. An employer remains free to terminate an at-will employee who engages in grousing or complaining about matters falling short of a "clear mandate of public policy" or who otherwise interferes with the ordinary operation of the workplace by expressions of personal views on matters of no real substance. Baseless complaints or expressions of purely personal views about the meaning of public policies will not meet the test for a "clear mandate" regardless of the manner or mode in which they are voiced.

■ This appeal also presents us with a second aspect of plaintiff's *Pierce* claim, not directly addressed by the appellate panel. In order to overcome the motion for summary judgment, plaintiff was also required to identify a clear mandate of public policy that PW violated, which raises the question of whether the conflict of interest provisions of the RPCs suffice for this purpose.

Although we did not create an exhaustive list in *Pierce*, we identified some sources of public policy mandates which could support relief. We held that the sources "include legislation; administrative rules, regulations or decisions; and judicial decisions." *Pierce, supra,* 84 *N.J.* at 72, 417 *A.*2d 505. We went further, however, because Dr. Pierce pointed to the Hippocratic Oath as a code of ethics that should qualify as a clear public policy mandate, arguing that her termination for adhering to its dictates should support relief. In rejecting that assertion, we commented that "[i]n certain instances, a professional code of ethics may contain an expression of public policy. However, not all such sources express a clear mandate of public policy. For example, a code of ethics designed to serve only the interests of a profession ... probably would not be sufficient." *Ibid.*

We have previously concluded that, in some circumstances, a statutory conflict of interest provision could suffice as a clear public policy mandate. *MacDougall v. Weichert,* 144 *N.J.* 380, 401–03, 677 *A.*2d 162 (1996) (considering implications of the Local Government Ethics Law, *N.J.S.A.* 40A:9–22.1 to –22.25). We looked to the statute to decide whether the employee was terminated for reasons that would equate with a violation of that statutory prohibition. *Id.* at 402, 677 *A.*2d 162. In that context, we found a sufficient expression of public interest in the statute to permit the claim to proceed to trial. *Id.* at 403, 677 *A.*2d 162. Our consideration of the record in this matter leads us to a similar conclusion. Although we need not consider whether the RPCs in general would suffice for this purpose, we find in RPC 1.7(b), relating to conflicts of interest, a sufficiently clear expression of a public policy mandate to permit it to support a *Pierce* cause of action. We do so, however, because this RPC, like the statute we considered in *MacDougall,* implicates such basic duties embraced in our rules relating to conflicts of interest, *see In re Opinion No. 653 of the Advisory Comm. on Prof'l Ethics,* 132 *N.J.* 124, 129, 623 *A.*2d 241 (1993) ("One of the most basic responsibilities incumbent on a lawyer is the duty of loyalty to his or her clients. From that duty issues the prohibition against representing clients with con-

flicting interests."); *see also State ex rel. S.G.*, 175 *N.J.* 132, 139, 814 *A.*2d 612 (2003) ("RPC 1.7 is rooted in the concept that '[n]o man can serve two masters,' . . . ."), that it may implicate the kind of clear policy mandates that *Pierce* is designed to remedy.

We do not end our analysis there, however. We have concluded that the trial court and the appellate panel erred in requiring proof of an external complaint as a prerequisite to recovery on the *Pierce* claim. Because plaintiff's claim was dismissed prior to the conclusion of discovery and trial, however, we cannot determine whether plaintiff's proofs would suffice. Although the record is far from clear, plaintiff may be able to demonstrate that she identified a clear mandate of public policy [2] and had a legitimate dispute with her supervisors about the obligation to give notice of conflicts of interest in writing rather than orally. Plaintiff's supervisors had a different view of the applicable ethical rules and concluded that there might not be a conflict at all or, if there were, that oral notification would suffice. Nevertheless, in order to prevail, plaintiff must do more than simply identify the alleged ethical violation, and she must do more than simply assert that she complained to her immediate supervisors. Consistent with our interpretation of *Pierce*, although she need not have voiced a complaint to an external authority, she must demonstrate that she took other action reasonably calculated to prevent the objectionable conduct. This could be demonstrated if plaintiff, for example, established that she refused to comply with the directives from her supervisors that she believed violated the RPCs and was terminated as a result, or that she complained to someone within the corporate structure at a high enough level of authority to demonstrate that her subsequent termination was contrary to public policy.

---

[2] We have assumed for our analysis that plaintiff relied on RPC 1.7(b) because of the description in the record about the substance of the dispute. We leave plaintiff to her proofs, however, because if she based her complaint on the other RPCs referred to in her brief, she will not be able to sustain this element of her cause of action.

Moreover, in this context, plaintiff's mere good faith disagreement about the meaning of the RPC will not alone support relief. Although we have previously, in the CEPA context, declined to require that a plaintiff prove an actual violation of public policy, *see Dzwonar v. McDevitt*, 177 *N.J.* 451, 464, 828 *A.*2d 893 (2003), we did so because we concluded that the goal of CEPA was " 'not to make lawyers out of conscientious employees but rather to prevent retaliation against those employees who object to employer conduct that they reasonably believe to be unlawful or indisputably dangerous to the public health, safety or welfare.' " *Ibid.* (quoting *Mehlman, supra,* 153 *N.J.* at 193–94, 707 *A.*2d 1000). However, *Pierce* requires the employee to prove not only that he or she complained about a public policy, but that his or her resulting discharge violated a clear mandate of public policy. Therefore, in the context of this attorney who contends that she was terminated by her employer in retaliation for her complaint about a violation of an RPC, we have no difficulty in requiring more. Both because attorneys should be knowledgeable about the RPCs, and because they have an independent obligation to report violations to the appropriate authorities, *see* RPC 8.3, we impose upon them a higher standard in order to maintain a *Pierce* claim founded on a public policy embodied in an RPC. We therefore conclude that plaintiff, in order to prevail on this claim, must also demonstrate that the employer's behavior about which she complained actually violated RPC 1.7. Any lesser standard of proof would threaten to expand *Pierce* far beyond its intended boundaries and would inappropriately intrude on the role of our disciplinary authorities.

Because we cannot determine from the relatively sparse record whether plaintiff's *Pierce* allegations will suffice to meet these proof requirements, we are constrained to reverse the judgment in favor of defendants on that claim and remand it for further proceedings, which shall include a determination about whether plaintiff's *Pierce* claim should proceed to trial.

## IV.

We next consider defendants' argument that the appellate panel erred in concluding that plaintiff was entitled to an adverse inference charge in addition to her bifurcated substantive claim for relief based on defendants' failure to produce certain documents plaintiff demanded in discovery. We begin with a brief explanation of the factual and procedural background that gave rise to this issue. The spoliation claims relate to a series of documents that plaintiff believed had been created by PW, its HR department, or Janick, contemporaneously with the events that gave rise to her substantive claims for discrimination. Included were: (1) documents relating to plaintiff's 1995 complaint about Seltzer and the internal investigation that followed that complaint; (2) a memo to a file dictated by Janick and typed by his secretary at or about the time of plaintiff's transfer to the EDR Unit; and (3) documents about employee productivity that would have been relevant to Franklin's assertion that plaintiff was not as productive in her various assignments as were other employees.

Plaintiff asserted that those documents were or should have been maintained in the course of defendants' business and that they would not have been discarded under PW's ordinary document retention practices. In the alternative, plaintiff asserted that as soon as she told Bubko that her attorney would contact the company about her termination, PW was on notice of her potential claim and under a duty to retain any and all documents that might be used in her threatened litigation. Although plaintiff requested that defendants produce documents [3] during discovery, defendants

---

[3] In a prior interlocutory appeal, defendants attempted to preclude plaintiff from keeping or using similar documents relating to other employees, arguing that she had obtained those documents through deceptive or other unlawful means. *Tartaglia v. Paine Webber, Inc.*, 350 *N.J.Super.* 142, 144–45, 794 *A.2d* 816 (App.Div.2002). The Appellate Division declined to apply the exclusionary rule to this civil dispute, leaving the question of admissibility for further analysis at trial. *Id.* at 149–52, 794 *A.2d* 816. We note only that the documents in dispute in this appeal are generally similar to those documents, and the existence

did not turn over anything that met the description of the documents she requested.

Plaintiff asserted that the documents were relevant to her claims and that defendants had destroyed them either intentionally or negligently. Therefore, the trial court granted plaintiff leave to amend her complaint, prior to trial, to add two counts asserting causes of action for intentional and negligent spoliation based on defendants' failure to produce the requested documents during discovery. The trial court bifurcated the spoliation counts from the discrimination claims, with the understanding that the same jury that decided the substantive claims would be charged on the spoliation counts immediately after returning its verdict on plaintiff's case in chief.

All of the evidence relating to the existence and asserted substance of the disputed documents was offered during the trial on the substantive discrimination claims and plaintiff requested an adverse inference charge relating to those documents in that phase of the trial. That application was denied because the court concluded that an adverse inference charge was inappropriate in the absence of proof that defendants had intentionally destroyed evidence. Moreover, the court reasoned that plaintiff's rights would be fully protected by permitting her to comment on the missing documents as part of her closing arguments and by allowing her to proceed separately on the bifurcated spoliation counts.

When the jury rendered its verdict on the substantive claims in defendants' favor, the court[4] proceeded with the bifurcated spoliation counts, permitting further closing arguments and charging the jury on the law applicable to those counts. Because plaintiff had not had the benefit of the adverse inference charge, the jury

---

of the documents in the earlier appeal serves as some support for plaintiff's assertion that the disputed documents also existed.

[4] Although the trial on the spoliation counts proceeded immediately after the jury returned its verdict, a different judge presided.

was permitted to consider whether the disputed documents existed, whether they had been destroyed, and whether the substantive verdict would have been different if the documents had been available. While the jury was deliberating, and apparently because of the parties' concerns about whether a sufficient number of jurors would be able to remain and reach a verdict, the parties settled the bifurcated spoliation counts.

On appeal, plaintiff argued that the trial court erred in refusing to grant her request for an adverse inference charge, and defendants countered that plaintiff's rights were fully vindicated by the preservation of her bifurcated spoliation counts. The appellate panel first commented that there were significant factual disputes both about whether the disputed documents existed at a time when defendants had a duty to preserve them and whether they were intentionally destroyed. Nevertheless, the panel concluded that the trial court erred in refusing to give an adverse inference charge, but cautioned that, on retrial, the language of the charge would need to be balanced in light of the competing factual assertions of the parties.

As part of this appeal, defendants argue that the Appellate Division's direction that plaintiff have the benefit of an adverse inference charge as part of a retrial on her substantive claims contravenes the letter and the spirit of this Court's decision in *Rosenblit v. Zimmerman*, 166 *N.J.* 391, 766 *A.*2d 749 (2001), and ignores the Appellate Division's own earlier explanation of the theory supporting spoliation remedies, *see Viviano v. CBS, Inc.*, 251 *N.J.Super.* 113, 597 *A.*2d 543 (App.Div.1991). Defendants assert that, at its heart, the adverse inference charge is designed to "level the playing field" when one party has affirmatively and wrongfully acted to create an imbalance. They therefore argue that the bifurcated spoliation claims completely protected plaintiff, that there was no "unevenness in the playing field" to be corrected, and that the Appellate Division overstepped its authority and inappropriately substituted its view for that of the trial court.

This appeal requires us to analyze the relationship between a claim of spoliation raised as part of plaintiff's trial on her substantive claims and a separately pleaded claim for spoliation of evidence by defendants. It requires that we consider whether the spoliation remedies outlined in *Rosenblit* are mutually exclusive and, if they are not, the manner in which a duplicative damage award can be avoided. In doing so, we must consider our decision in *Rosenblit* in full, particularly in light of its theoretical underpinnings as a means to address the question before us.

The history of spoliation in our courts and the basis of our decision in *Rosenblit* can be traced back to the Appellate Division's decision in *Viviano, supra,* 251 *N.J.Super.* at 113, 597 *A.*2d 543. There, an injured plaintiff secured evidence from her employer pointing to liability of a third party machine manufacturer. The plaintiff, however, received that evidence only after the statute of limitations had expired. When plaintiff learned that her employer had concealed the identifying information from her until it was too late for her to proceed against the manufacturer, she sought to pursue her remedy against the employer in its place. In addressing that claim, the court considered whether there were sound public policy reasons for permitting a party to proceed upon a cause of action for fraudulent concealment of evidence. The Appellate Division described that theory as being "analogous to" spoliation, which was a cause of action then newly recognized in California. *Id.* at 125–26, 597 *A.*2d 543 (citing *County of Solano v. Delancy,* 264 *Cal.Rptr.* 721, 729 (Ct.App.1989)). Without embracing that new tort concept of spoliation, the *Viviano* court found ample room for the plaintiff to proceed, noting that "[i]mmunizing the willful destruction or concealment of evidence would not further the policy of encouraging testimonial candor." *Id.* at 126, 597 *A.*2d 543.

Two years later, the Law Division explored the contours of the then still-developing theory of spoliation further. *See Hirsch v. General Motors Corp.,* 266 *N.J.Super.* 222, 628 *A.*2d 1108 (Law Div.1993). In that dispute, the roles of the parties were reversed,

and the court considered the parameters of the doctrine in the context of a plaintiff's negligent spoliation of evidence and its impact on a defendant's ability to effectively defend against that plaintiff's allegations. In doing so, the court recognized that although the decision in *Viviano* would permit a plaintiff to pursue a separate cause of action based on fraudulent concealment, there was no similar remedy available to address the harm when a defendant was the victim of a plaintiff's act of spoliation. *Id.* at 245, 628 *A.*2d 1108; *see Nerney v. Garden State Hosp.*, 229 *N.J.Super.* 37, 40, 550 *A.*2d 1003 (App.Div.1988) (recognizing remedies for negligent loss of evidence that substantially prejudices rights of another party). Balancing all of the relevant considerations, the court concluded that discovery sanctions would protect the rights of parties, other than plaintiffs, who were victimized by spoliation, and that the creation of a new spoliation remedy was unnecessary. *Hirsch, supra,* 266 *N.J.Super.* at 245, 628 *A.*2d 1108.

This Court first considered the parameters of potential remedies for spoliation several years later when we decided *Rosenblit.* By the time we did so, numerous courts around the country had opined on the problems presented by claims of spoliation, and several alternate theories had been proposed and adopted. *See Rosenblit, supra,* 166 *N.J.* at 401–05, 766 *A.*2d 749 (discussing decisions from other jurisdictions). Recognizing that there were a variety of remedies that might be utilized by a court in civil litigation when one party destroys evidence that is material to the underlying claim, this Court adopted a balanced approach. We pointed out that in order to ensure appropriate relief, the choice of remedies would depend in part on the timing of the discovery of the spoliation. *See id.* at 407, 766 *A.*2d 749. The heart of our holding reflects our analysis:

A party's access to the remedies we have catalogued will depend upon the point in the litigation process that the concealment or destruction is uncovered. If it is revealed in time for the underlying litigation, the spoliation inference may be invoked. In addition, the injured party may amend his or her complaint to add a count for fraudulent concealment.... [T]hose counts will require bifurcation because the fraudulent concealment remedy depends on the jury's assessment of

the underlying cause of action. In that instance, after the jury has returned a verdict in the bifurcated underlying action, it will be required to determine whether the elements of the tort of fraudulent concealment have been established, and, if so, whether damages are warranted.

[*Id.* at 407–08, 766 *A.*2d 749.]

This approach was based on a number of considerations. First, we pointed out that the *Viviano* court did not create a new tort, but merely utilized the existing, well-established, tort of fraudulent concealment as a means to remedy spoliation. We agreed with that approach, cautioning that it was "not novel, but merely an invocation of the previously recognized tort of fraudulent concealment, adapted to address concealment or destruction during or in anticipation of litigation." *Id.* at 406, 766 *A.*2d 749. We identified the elements that must be established to sustain a claim for fraudulent concealment in the spoliation context:

(1) That defendant in the fraudulent concealment action had a legal obligation to disclose evidence in connection with an existing or pending litigation;

(2) That the evidence was material to the litigation;

(3) That plaintiff could not reasonably have obtained access to the evidence from another source;

(4) That defendant intentionally withheld, altered or destroyed the evidence with purpose to disrupt the litigation;

(5) That plaintiff was damaged in the underlying action by having to rely on an evidential record that did not contain the evidence defendant concealed.

[*Id.* at 406–07, 766 *A.*2d 749.]

Second, however, we also concluded that the trial court was empowered to make use of an adverse inference in the trial of the case in chief as a means to remedy both the discovery infraction and the harm resulting from spoliation. *Id.* at 401, 766 *A.*2d 749. It was in this context that we commented that the choice as among the available remedies is based in part on when during the litigation the destruction or disappearance of the evidence becomes manifest. Thus, as a practical matter, a party's access to the various remedies for spoliation often depends on when the destruction of evidence is discovered. *Id.* at 407, 766 *A.*2d 749. If the spoliation is discovered while the underlying litigation is ongoing, the adverse inference may be invoked and the party is permitted to amend the complaint to add a count for fraudulent

concealment, but the counts must then be bifurcated. *Ibid.* The same jury would first try the underlying claim and then, after returning a verdict, would hear the fraudulent concealment claim. *Ibid.* If, on the other hand, the spoliation is not uncovered until after the underlying action "has been lost or otherwise seriously inhibited, the plaintiff may file a separate tort action." *Id.* at 408, 766 *A.*2d 749.

Although we made it clear that an aggrieved party could be entitled to the benefit of both an adverse inference and a separate cause of action, *see id.* at 411, 766 *A.*2d 749, we did not specifically consider the relationship between the alternative methods for addressing spoliation or whether, as defendants argue, they may present a sufficient risk of duplicative relief such that they should be mutually exclusive. Of particular significance to this appeal, we did not consider whether a plaintiff who succeeds on either the case in chief with the benefit of an adverse inference or, in its absence, on the separately-tried bifurcated claim, is thereafter precluded from further recovery on the claim.

 The matter now before us well illustrates the apparent confusion that has resulted from our discussion in *Rosenblit* about the relationship between the time when an act of spoliation is discovered and the appropriate remedy. That apparent confusion, however, is readily remedied through a further explanation of the underpinnings of the concepts. First, there is a distinction to be drawn based on the identity of the alleged spoliator. That is to say, acts of spoliation by parties may give rise to the court's use of discovery and evidentiary sanctions and may also support separate counts in the nature of fraudulent concealment claims that are bifurcated for determination after the verdict is returned on the other substantive claims.[5] Our decision in *Rosenblit* made it plain

---

[5] Although the court in *Hirsch, supra,* 266 *N.J.Super.* at 245, 628 *A.*2d 1108, presumed that an act of spoliation by a plaintiff can best be addressed through use of a discovery or evidentiary sanction, there is nothing in theory that would

that such a claim must proceed in accordance with the ordinary elements of a fraudulent concealment claim. On the other hand, an act of spoliation by a third party, including a reckless one, *see Jerista v. Murray*, 185 *N.J.* 175, 201–03, 883 *A.*2d 350 (2005), will not often give rise to an evidentiary sanction in the trial of the case in chief, but instead will be addressed in a separate proceeding.

Second, the time when the act of spoliation is discovered will affect the manner in which the court can address it. In the context of a claim of spoliation by a defendant, the use of an adverse inference should create a complete substantive remedy because the jury will decide, as part of the case in chief, whether the missing evidence existed and was destroyed by defendant. If so, the jury will decide the substantive issue as if that evidence assisted the plaintiff. That does not mean, however, that a verdict for plaintiff on the substantive claim will preclude recovery on the bifurcated claim, as some courts have suggested. *See, e.g., Rizzuto v. Davidson Ladders, Inc.*, 280 *Conn.* 225, 905 *A.*2d 1165, 1180 (2006) (holding that "[t]o establish proximate causation, the plaintiff must prove that the defendants' intentional, bad faith destruction of evidence rendered the plaintiff unable to establish a prima facie case in the underlying litigation"); *Hannah v. Heeter*, 213 *W.Va.* 704, 584 *S.E.*2d 560, 573 (2003) (concluding that once plaintiff has demonstrated all but the damage elements of the spoliation tort, a rebuttable presumption arises that but for the spoliation, the aggrieved party would have prevailed in the underlying suit).

Instead, in that circumstance, the subsequent prosecution of the bifurcated claim will not create a duplicative recovery because the focus in that proceeding will be on the damages, both compensatory and punitive, incurred in having to proceed without the destroyed evidence. That is to say, if a plaintiff has already

preclude an adversely affected defendant from proceeding on the independent fraudulent concealment theory as we describe it herein.

prevailed on the substantive claim with the benefit of the adverse inference, the bifurcated proceeding cannot be an opportunity for the jury to consider anew whether its substantive verdict would have been different had the missing evidence been considered. In that context, the bifurcated counts will offer the plaintiff a chance to recover additional compensatory damages limited to the further costs of proceeding without the spoliated evidence, or costs incurred in an effort to replace that evidence, together with, if appropriate, a punitive award. On the other hand, if the act of spoliation is discovered after the verdict in the case in chief has been returned, the cause of action for the fraudulent concealment will be entirely separate and, depending on the outcome of the original trial, may include both consideration of the substantive counts as well as the further spoliation-based damages.

There is no inherent contradiction between permitting a plaintiff to try the case in chief, absent the missing evidence, but with the benefit of an adverse inference change, and permitting the same plaintiff to proceed as well on the substance of the intentional spoliation claim in a bifurcated proceeding. The evils to be remedied are not the same and, as long as the matter is carefully charged to the jury, the awards of damages will not overlap. Although some courts have held that the availability of the bifurcated cause of action turns on whether plaintiff succeeds on the substantive claim itself, *see Rizzuto, supra*, 905 *A.*2d at 1180; *Hannah, supra*, 584 *S.E.*2d at 573, we see them as different remedies serving different purposes.

Therefore, whether a plaintiff succeeds on the claim in the original litigation or not, there are damages that might be recovered, including punitive damages, in the event that the plaintiff can demonstrate that the loss of the evidence caused that plaintiff to incur costs or expenses in the litigation that would not otherwise have been incurred. Thus, for example, a plaintiff who is deprived of evidence due to a defendant's spoliation and is therefore required to hire additional experts or to develop and rely on alternate proofs might well sustain damages separate and apart

from those incurred as a result of the underlying cause of action. Likewise, a plaintiff who is deprived of the use of a tangible thing and is forced to employ an expert to create a model based on photographs or verbal descriptions might well be entitled to those costs as an element of her damages on the bifurcated claim. At the same time, there may be no damages to be attributed to spoliation separate and apart from the damage award in a plaintiff's case in chief in a particular matter. Although there is, to be sure, some risk that a plaintiff who succeeds in the main claim will seek a double recovery through the mechanism of a bifurcated spoliation claim, we consider that risk to be relatively a minor one when compared to the risk that a contrary ruling might encourage spoliators by providing little disincentive to them.

Seen in this light, the purposes to be served by the adverse inference charge and by the bifurcated spoliation claim are different. We implicitly recognized as much in *Rosenblit*, and we reiterate that we did not intend, by our language in *Rosenblit*, to foreclose the possibility that more than one form of relief may be appropriate in a specific case in order to remedy the evil. Although the time when an act of spoliation is discovered will indeed strongly suggest the appropriate course of action in that case, the matter before us well illustrates the possibility that more than one remedy may be available, if a plaintiff has the ability to muster the appropriate proofs.

 That, however, does not completely address defendants' arguments in light of the unusual procedural posture of this matter. Here, the trial court's refusal to give the adverse inference charge was coupled with a bifurcated proceeding in which the jury was invited to consider how it would have decided the case in chief if the evidence in question existed and was either intentionally or negligently [6] destroyed. The trial court reasoned that plain-

---

[6] Although not directly raised by the parties, we are constrained to comment that spoliation claims, as between parties to a particular litigation, are technically claims for fraudulent concealment. *See Rosenblit, supra,* 166 *N.J.* at 406, 766

tiff's ability to proceed on her bifurcated claims for spoliation would obviate the need for an adverse inference charge. The appellate panel, having concluded that plaintiff was entitled to a new trial on her substantive claims, reasoned that the trial court's analysis was in error and that plaintiff would be entitled to the benefit of the adverse inference charge at the retrial. We agree with the appellate panel's conclusion that plaintiff should have had the benefit of the adverse inference charge and should be afforded one as a part of the new trial on her substantive claims. Although we recognize that the unusual procedural posture in which the bifurcated claim was settled poses some risk of an overlapping recovery, we leave it to the sound discretion of the trial judge to consider whether, in this matter, any recovery by plaintiff on remand should be molded to avoid duplicative relief.

## V.

We next consider the arguments of the parties concerning the retaliation charge and the evidence relating to retaliation. At trial, plaintiff offered evidence that she twice complained to HR about perceived acts of sexual harassment. The first such complaint followed Seltzer's "wedding remark," and included both it and other comments and behavior by Seltzer around the time of plaintiff's transfer out of Seltzer's department. Plaintiff's second complaint to HR followed the "wet my pants" remark and was based on both the statement itself and Janick's laughter in response.

At trial, plaintiff contended that she was terminated in retaliation for one or both of these complaints. That is, she asserted that her complaints constituted protected activity and that she was discharged, in violation of the LAD, in retaliation for those complaints. The trial court concluded, as a matter of law, that only

---

A.2d 749. Because they continue to be a type of fraud claim, we have not in the past recognized, and we do not now recognize, any separate tort for negligent spoliation.

plaintiff's first complaint, in response to the "wedding remark," qualified as protected activity, reasoning that plaintiff's second complaint was not because neither the "wet my pants" remark nor Janick's laughter was inherently sexual. As a result, the court concluded that plaintiff's second complaint could not be used to support a retaliatory termination claim.

The trial court therefore instructed the jury to limit their consideration of the retaliation claim to plaintiff's complaint about the "wedding remark" and that they should disregard the "wet my pants" remark as it related to the retaliatory discharge allegation. During deliberations, the jury twice asked for clarification of the use to which the "wet my pants" remark might be put. Each time, the court simply responded by reiterating that the comment and the response could not be the basis for the retaliation claim.

The appellate panel concluded that the trial court erred. In short, the panel found that the trial court had misapprehended the implications of the "wet my pants" remark, improperly analyzed its relevance to plaintiff's claim for retaliation, and inappropriately limited the evidence that the jury was permitted to consider in its evaluation of the claim for retaliatory discharge. The panel therefore reversed the verdict in defendants' favor and remanded for a new trial on the retaliation claim.

Defendants argue that the appellate panel erred, effectively precluding the trial court from concluding, as a matter of law, that plaintiff had not carried her prima facie burden of proof and thereby limiting the issues that the jury might appropriately consider. In the alternative, defendants argue that the panel erred because it has permitted plaintiff to proceed on a discrimination-based theory when there was no evidence that the comment in question was made to her because of her gender. Moreover, defendants assert that because the jury was instructed that plaintiff had, as a matter of law, carried her burden of proving that she engaged in protected activity when she first complained to HR about the "wedding remark," any limitation on the evidence relating to her complaint was harmless.

The essential principles of law that govern this aspect of the appeal, which are derived from the LAD, are well settled. The LAD declares that it is an unlawful employment practice "to take reprisals against any person because that person has opposed any practices or acts forbidden under this Act." *N.J.S.A.* 10:5–12(d). We have explained that, traditionally, there are three elements to a plaintiff's prima facie case for retaliatory discharge. *See Craig v. Suburban Cablevision, Inc.,* 140 *N.J.* 623, 629–30, 660 *A.*2d 505 (1995). In particular, we held that "[t]o establish a prima facie case of discriminatory retaliation, plaintiffs must demonstrate that: (1) they engaged in a protected activity known by the employer; (2) thereafter their employer unlawfully retaliated against them; and (3) their participation in the protected activity caused the retaliation." *Ibid.* (citing *Jamison v. Rockaway Twp. Bd. of Educ.,* 242 *N.J.Super.* 436, 445, 577 *A.*2d 177 (App.Div. 1990); *Wrighten v. Metropolitan Hosps., Inc.,* 726 *F.*2d 1346, 1354 (9th Cir.1984)). More recently, we refined that analysis and held that, as a prerequisite for proceeding on a retaliatory discharge claim, a plaintiff must also bear the burden of proving that he or she had a good faith, reasonable basis for complaining about the workplace behavior. *See Carmona v. Resorts Int'l Hotel, Inc.,* 189 *N.J.* 354, 373, 915 *A.*2d 518 (2007).

Those principles, however, do not directly address the question raised here. To be sure, we have held that the court decides, as a matter of law, whether or not a plaintiff has carried his or her burden of demonstrating the elements of the prima facie case and that those elements are not part of the proofs at trial for reconsideration by the jury. *See Zive v. Stanley Roberts, Inc.,* 182 *N.J.* 436, 457, 867 *A.*2d 1133 (2005); *Mogull v. CB Commercial Real Estate Group, Inc.,* 162 *N.J.* 449, 473, 744 *A.*2d 1186 (2000). Moreover, as defendants point out, the Model Jury Charge permits the trial court to instruct the jury, as the court did in this trial, that the particular protected activity has been established. *See* Model Jury Charge (Civil) 2.22 "LAD Retaliation" (May 1991). Neither, however, is inconsistent with the appellate panel's conclusion in this matter.

Plaintiff presented evidence that she made two separate complaints, at different times, and arising from two unrelated events or series of events, about treatment, comments, or behaviors that she considered to be sexual harassment. For purposes of our discussion, we have referred to the first as the "wedding remark" even though plaintiff's complaint was not limited to that single incident and included other behaviors attributed to Seltzer around the same time. That complaint, as we have seen, resulted in a swift response by HR and a cessation of the complained-of behaviors. Defendants do not suggest that the trial court erred in concluding that that complaint constituted protected activity on plaintiff's part.

Our focus, instead, is on the series of events that surround plaintiff's second complaint to HR. That complaint related to Seltzer's "wet my pants" remark and Janick's laughter in response. The trial court concluded that this remark was not "sexual" in nature and that therefore plaintiff's complaint about it could not qualify as protected activity. We, however, like the appellate panel, conclude that this was an unnecessarily strained view of our law.

The LAD, broadly understood, prohibits an employer from discriminating against an employee based on sex, among other things. *N.J.S.A.* 10:5–12. A complained-about comment or behavior need not be overtly sexual in nature to be actionable; rather, it need only have occurred because of the affected employee's sex. *Lehmann v. Toys 'R' Us, Inc.,* 132 *N.J.* 587, 602, 626 A.2d 445 (1993). More to the point, however, this count of plaintiff's complaint did not seek to recover for the discrimination represented by the remark and response themselves, but instead because she perceived that her supervisors retaliated against her after she complained. In that context, the issue is not whether the "wet my pants" remark and Janick's laughter occurred, or even whether they occurred because of plaintiff's sex. Instead, the issue is whether plaintiff's complaint was both reasonable and made in the good faith belief that these events occurred because of

her sex. *See Carmona, supra,* 189 *N.J.* at 373, 915 *A.*2d 518; *see also Kluczyk v. Tropicana Prods., Inc.,* 368 *N.J.Super.* 479, 493, 847 *A.*2d 23 (App.Div.2004) (holding that "a retaliatory discharge in violation of the LAD can occur even if there was no underlying unlawful harassment"); *Woods–Pirozzi v. Nabisco Foods,* 290 *N.J.Super.* 252, 275, 675 *A.*2d 684 (App.Div.1996) (determining that plaintiff "clearly engaged in protected activity" under the LAD when she filed a charge with the EEOC); *Melick v. Twp. of Oxford,* 294 *N.J.Super.* 386, 397, 683 *A.*2d 584 (App.Div.1996) (acknowledging that trial court properly concluded that protected activity included plaintiff's complaints to employer about disability discrimination).

Unless plaintiff failed to meet her burden of establishing that her complaint about the remark and response was made reasonably and in good faith, *see Carmona, supra,* 189 *N.J.* at 373, 915 *A.*2d 518, she was entitled to an instruction to the jury that her complaint constituted protected activity. On retrial the trial court might conclude that there remains an issue of fact about whether the "wet my pants" remark and Janick's responsive laughter supported a reasonable, good faith belief by plaintiff that they were directed at her because of her sex and, therefore, that her complaint constituted protected activity. In that circumstance, an appropriate charge to the jury that will permit it to decide the factual issue presented will sufficiently protect the rights of the parties.

■ In this matter, the trial court's charge that the jury could not consider the second complaint in its evaluation of the retaliation claim was error because "the jury charge as a whole was not 'clear in how the jury should apply the legal principles charged to the facts of the case at hand.'" *Carmona, supra,* 189 *N.J.* at 374, 915 *A.*2d 518 (quoting *Viscik v. Fowler Equip. Co.,* 173 *N.J.* 1, 18, 800 *A.*2d 826 (2002)). As evidenced by the jury's requests for guidance about how plaintiff's second complaint and the facts that led to it should be evaluated, it is clear that the error in the charge, repeated in the supplemental charges, was not harmless.

## VI.

Finally, in light of our direction that this matter be tried anew, we find it appropriate to address briefly the assertions on appeal about the closing arguments made on behalf of defendants.

 Plaintiff complains that two aspects of the summation were unduly prejudicial. Briefly described, the first was a story about a hard-working "immigrant woman" used to contrast with evidence in the trial about plaintiff's work ethic. The second consisted of references to plaintiff's absences from the courtroom during the trial, from which the jury was invited to draw inferences about her behavior as an employee. Because plaintiff's counsel did not object to these portions of the defense counsel's summation, we review these remarks under the plain error standard. *Fertile v. St. Michael's Med. Ctr.*, 169 *N.J.* 481, 493, 779 *A.*2d 1078 (2001). That is, we must determine whether defense counsel's comments had the " 'clear capacity for producing an unjust result.' " *Ibid.* (quoting *State v. Melvin*, 65 *N.J.* 1, 18, 319 *A.*2d 450 (1974)); *R.* 2:10–2.

 In general, we afford counsel broad latitude in closing arguments. *Bender v. Adelson*, 187 *N.J.* 411, 431, 901 *A.*2d 907 (2006). Comments during summation, however, should be centered on the truth and counsel should not " 'misstate the evidence nor distort the factual picture.' " *Ibid.* (quoting *Colucci, supra*, 326 *N.J.Super.* at 177, 740 *A.*2d 1101). Therefore, although counsel has great latitude during closing arguments, "comment must be restrained within the facts shown or reasonably suggested by the evidence adduced." *State v. Bogen*, 13 *N.J.* 137, 140, 98 *A.*2d 295 (1953). An appellate court, however, may view counsel's failure to object to summation remarks as "speaking volumes about the accuracy of what was said." *Fertile, supra*, 169 *N.J.* at 495, 779 *A.*2d 1078 ("We presume that when a lawyer observes an adversary's summation, and concludes that the gist of the evidence has been unfairly characterized, an objection will be advanced.").

The Appellate Division agreed with plaintiff that these two aspects of defendants' closing remarks were neither relevant to any issue nor supported by any evidence in the record and were unduly prejudicial to plaintiff. Defendants argue that the panel held them to too high a standard, inconsistent with the broad latitude that courts ordinarily afford counsel during closing arguments. We disagree.

The anecdote about the hard-working immigrant woman, which is asserted to be true, is nevertheless entirely unsupported by the record. Its not-so-subtle suggestion was that plaintiff was not a victim of discrimination and retaliation, but instead was lazy, unmotivated, and unappreciative of the efforts defendants made to retain her in her position. Although defendants were of course free to suggest that plaintiff had failed to carry her burden of proof and to do so in forceful terms, we do not condone the use of entirely unsupported stereotypes and innuendo in the effort.

Similarly, in light of the significant evidence in the record that plaintiff's occasionally early exit from the courtroom and her failure to attend trial every day were due to her medical condition, defendants' suggestion that plaintiff's absence was evidence of an unacceptable attitude that should be independently condemned by the jury cannot be permitted to stand unchallenged. There is, indeed, a place in closing argument for forceful language and for strong words. There is even a place for suggesting that a plaintiff is not to be believed or that her actions belie her assertions in the trial. We agree with the Appellate Division that there was no place, however, for those remarks.

## VII.

The judgment of the Appellate Division is reversed to the extent that it affirmed the dismissal of plaintiff's *Pierce* claim; it is affirmed as modified to the extent that it reversed the jury verdict in defendants' favor on plaintiff's claims for wrongful discharge and for retaliation; it is affirmed to the extent that it concluded

that the closing arguments were inappropriate; and the matter is remanded to the Law Division for further proceedings.

*For affirmance in part/reversal in part/remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.