**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4283-16T3

GEORGE AKSHAR,

    Plaintiff-Appellant,

v.

PUBLIC SERVICE ELECTRIC
AND GAS COMPANY (PSE&G),
and HUGH D. SWEENEY,

    Defendants-Respondents.

_____

> Submitted September 13, 2018 – Decided January 14, 2019
>
> Before Judges Simonelli and Whipple.
>
> On appeal from Superior Court of New Jersey, Law Division, Passaic County, Docket No. L-3370-13.
>
> Buglione, Hutton & Deyoe, LLC, attorneys for appellant (Richard J. Turano, on the brief).
>
> Tracy L. Bookhard, attorney for respondents.

PER CURIAM

In this employment matter, plaintiff George Akshar appeals from the May 18, 2017 Law Division order denying his motion for reconsideration of the May 12, 2016 order granting summary judgment to defendants Public Service Electric and Gas Company (PSE&G) and Hugh D. Sweeney and dismissing plaintiff's common law wrongful termination claim with prejudice. For the following reasons, we affirm.

I.

Plaintiff began his employment with PSE&G in 2007. In September 2011, he worked in the electric division in Clifton as an underground division mechanic who performed various activities to provide electric service to PSE&G customers. Labor Union International Brotherhood of Electrical Workers Local 94 (Union) represented him for collective bargaining purposes.

On September 25, 2011, plaintiff and Peter Alvarado, a division mechanic assistant or "helper," were dispatched to a customer's residence to reconnect electric service. They had worked together prior to September 25, 2011.

Restoring service at the residence required plaintiff to enter a manhole and reconnect service underground. Plaintiff did this type of work on a daily basis prior to September 25, 2011. Plaintiff's training required that prior to entering a manhole, he or his helper must use an atmospheric analyzer (analyzer) and set

2

up a guardrail around the manhole to prevent someone or something from falling into it, and he must wear specialty glasses to protect his eyes, a flame-retardant shirt, rubber gloves to protect against electrocution, and leather protectors over the rubber gloves.  This safety equipment was located in plaintiff's utility truck on September 25, 2011.  Plaintiff acknowledged that PSE&G provided its employees with training on safety equipment and took the safety equipment very seriously.  Plaintiff also admitted that PSE&G provided presentations on safety.

The purpose of the analyzer is to detect the presence of natural gas, carbon monoxide, and other toxins that could create an unsafe condition in the manhole and otherwise ensure that the underground mechanic can safely breathe while working in the manhole.  After a guardrail is set up and a ladder put into the manhole, and before the underground mechanic enters the manhole, the analyzer should be turned on and its hose put in the manhole to check the air quality for any presence of gas.  If the alarm on the analyzer goes off, the underground mechanic should not enter the manhole.  The underground mechanic has a blower and blanket to air out the manhole, but if there is too much gas in it, he should call dispatch.  If the manhole is safe for entry, the analyzer must remain activated for the entire time the underground mechanic works in the manhole to

monitor the air for gas. Plaintiff was trained not to enter a manhole if the analyzer pre-entry test revealed an unsafe situation.

Plaintiff and Alvarado did not set up the guardrail around the manhole or use the analyzer on September 25, 2011. Plaintiff's expert opined that the analyzer should have been used both before plaintiff entered the manhole and while he was working underground. Plaintiff also did not wear his flame-retardant shirt, safety gloves, or safety glasses. Rather, he entered the manhole wearing a short-sleeved shirt, personal glasses, and non-safety gloves.

A gas explosion occurred while plaintiff was in the manhole, causing third-degree burns to his right forearm and second-degree burns to his head, neck, back and face. After the incident, Alvarado set up the guardrail around the manhole and placed the analyzer on the guardrail, which is where it belonged if he and plaintiff were using it in accordance with their training.

PSE&G conducted an investigation of the incident and engaged an internal laboratory and contacted the manufacturer of the analyzer to determine if and when the analyzer was used on September 25, 2011. Both sources advised that the analyzer was turned on after Alvarado reported the incident to PSE&G.

A PSE&G supervisor responded to the scene shortly after the incident and saw plaintiff's flame-retardant shirt and safety gloves folded neatly in the utility

4

truck, which indicated plaintiff was not wearing this safety equipment at the time of the incident. PSE&G sent plaintiff's flame-retardant shirt to an external expert to determine whether plaintiff was wearing it at the time of the incident. The expert analyzed the shirt and determined it had "absolutely no evidence of any kind of thermal exposure, either scorching or charring." The expert concluded that if plaintiff had been wearing his flame-retardant shirt "he would have suffered little if any burn injury, primarily to his head and neck. There would have been no burns on his arms."

PSE&G also contacted the customer whose service plaintiff was restoring. The customer reported that the worker who exited the manhole, was wearing a T-shirt and that the guardrail and analyzer were not present around the manhole at the time of the incident.

Plaintiff was transported to the hospital after the incident, where he remained until October 13, 2011. He received outpatient treatment thereafter, and was cleared to return to work. On October 20, 2011, he and his Union representatives attended a fact-finding meeting with Sweeney and other PSE&G representatives. At the meeting, plaintiff lied and said he was wearing the flame-retardant shirt and safety gloves in the manhole, he and Alvarado utilized the guardrail and analyzer prior to the incident, they "used [the analyzer] all the

time[,]" and he knew the analyzer was working because he "heard the beep sound it makes when you turn it on and [he] heard it running as [he] went down the [man]hole." Sweeney advised plaintiff of the information PSE&G had to the contrary, but plaintiff denied he did not use these safety items or the guardrail. Plaintiff told the same lies to the Union.

After plaintiff left the fact-finding meeting, his Union representative stated to Sweeney: "None of your [air] analyzers are calibrated at the dock with the right times or dates[,]" and "[can] you guys tell me how the crews on Washington [Street] in Newark made three quarters of a splice using a torch and then all of a sudden every manhole on the street blew up because the gas sucked the flame from the torch into the duct."[1] Plaintiff relied on these statements to support his Pierce[2] claim, as well as a video of the Clifton shop that he took on the day of his termination, which depicted "the [air] analyzers getting calibrated to 11/15 instead of the right date, . . . which was 11/9[, and] . . . 15 something for the time, which is like 3 something, and it was like 10 o'clock in the

---

[1] Plaintiff claimed that shortly prior to the incident, there was a gas explosion in the manhole in Newark in which at least three PSE&G employees were working, and their air analyzers reportedly did not perform as expected, but they were not terminated.

[2] Pierce v. Ortho Pharm. Corp., 84 N.J. 58 (1980).

A-4283-16T3

morning." However, plaintiff admitted he never advised PSE&G management of this video. Therefore, the video was irrelevant to his Pierce claim.

PSE&G terminated plaintiff on November 9, 2011, for failing to use the safety equipment and lying during the fact-finding meeting. After his termination, plaintiff admitted to the Union that he had lied and apologized to Sweeney for lying. The Union did not challenge plaintiff's termination.

Plaintiff believed that his failure to wear the safety equipment and use the analyzer and his lies during the fact-finding meeting motivated PSE&G's decision to terminate his employment. Plaintiff did not recall discussing excess gas in manholes with PSE&G management and admitted he never complained to PSE&G management that the dates and times of the air analyzers were incorrect or the analyzers were defective or unreliable. Plaintiff also admitted that the date and time an analyzer displayed did not impact its functionality, and "didn't really serve any real relevance" to plaintiff's liability expert when forming his opinions. Plaintiff also admitted that he would bring the analyzer into the Metro Division when there was an issue and the analyzer was either repaired or replaced. Plaintiff further admitted that PSE&G management instructed him that he had the absolute right to stop any job he considered unsafe, and he did not recall ever stopping a job because of a defective air

analyzer. However, he maintained that his Union representative raised these issues on his behalf at the fact-finding meeting.

Both parties moved for summary judgment. The motion judge entered an order on May 12, 2016, granting summary judgment to defendants. In a written opinion, the judge dismissed plaintiff's wrongful termination claim, finding as follows:

> Despite [p]laintiff's allegations that the air analyzers were defective, and that manholes were dangerous due to the presence of gas, [plaintiff] has not satisfied either of the elements required by Pierce. There is no indication, as required under Pierce, that [p]laintiff refused to do something, or expressed disagreement to senior management regarding the air analyzers or the gas in the manholes. Instead, by all indications, [p]laintiff simply did not utilize the air analyzer or his safety equipment, because he deemed such safety measures to be ineffective, and he chose not to make use of them, which actions were contrary to PSE&G safety policy.
>
> There is no indication, based on the facts presented on this motion record, that [p]laintiff refused to use combustible producing tools in the manholes, or . . . to work in the manholes or to have his fellow employees use the air analyzers due to their alleged defective qualities, and that he expressed such protest to upper management, citing a specific rule or regulation, or even a generalized public policy mandate that, in his subjective opinion, was being violated. Plaintiff simply chose not to utilize his required safety gear, and as a result of that decision he was injured or suffered greater injuries than he would otherwise have

8

suffered had he utilized the safety gear as required by his employer – PSE&G. Plaintiff then lied about using the safety gear rather than protesting the effectiveness of the gear or the alleged dangerous conditions in the manholes. Only after he was caught lying and was subsequently terminated did [p]laintiff contort these facts into a cause of action under Pierce.

The judge also found that although plaintiff's expert opined about certain short-comings regarding the analyzers and that the manhole conditions violated Occupational Safety and Health Administration (OSHA) regulations, the expert failed to cite to any specific OSHA regulation or other regulation that PSE&G allegedly violated. The judge concluded that:

> Pierce requires an expression of disagreement with PSE&G's violation of a clear mandate of public policy. Even viewing the facts in a light most favorable to plaintiff, as the [c]ourt must do in connection with this motion, plaintiff has failed to set forth facts to support his contention that PSE&G violated a clear mandate of public policy and [that] he expressed to upper management a sufficient expression of disagreement with same.

The judge also concluded that even if plaintiff had established a prima facie case of wrongful termination, PSE&G "demonstrated ample valid reasons for terminating . . . [p]laintiff, none of which arise from any disagreement or potential disclosure of allegations regarding safety equipment. It is undisputed

9

that [p]laintiff failed to adhere to PSE&G's policy concerning the use of safety equipment and, subsequent to the accident, lied about same."

Plaintiff filed a motion for reconsideration, reiterating that, through his Union representative, he expressed to PSE&G senior management disagreement with the violation of a clear mandate of public policy. The motion judge disagreed, finding as follows in the judge's written opinion:

> It is undisputed that any statements made to management regarding the gas analyzers were made not by [p]laintiff, but by his [U]nion representative. This weighs heavily against plaintiff's argument that he expressed a clear objection to a violation of a public policy mandate. As set forth in the prior opinion, and . . . in [p]laintiff's deposition testimony, plaintiff did not object to the gas analyzers and express such objection to management, but simply did not use the gas analyzers, and then lied to management that he had made use of the analyzers. The fact that [p]laintiff's [U]nion representative objected to the gas analyzers in defense of [p]laintiff's job and/or actions does not rise to the level of a viable expression satisfying the requisite actions for a Pierce claim under Tartaglia[v. UBS Painewebber, Inc., 197 N.J. 81 (2008)].
>
> Significantly, there is no indication that [p]laintiff expressed his objections to his [U]nion representative and asked that such argument be advanced to upper-management. There is nothing in the record, which would advance that argument. Therefore, [p]laintiff never made any expression to management regarding any objection to faulty gas analyzers or gas in the manholes. Plaintiff misled management regarding his use of the gas analyzers, and never objected to the use

10

of the analyzers at all.  Even when his Union representative voiced such complaints, it was subsequent to    . . . [p]laintiff having lied about using the gas analyzers, never voicing any objection to the gas analyzers or gas in manholes prior to his accident, and failing to raise his objections when the opportunity presented itself at the fact finding meeting.

The [c]ourt reiterates that it is plainly evidence from the record in this case, that the only time the gas analyzers were brought up was in the context of [p]laintiff being subject to reprimand or possible termination.  Plaintiff has not pointed to anything in the record upon which a reasonable jury could find that he expressed a disagreement with a violation of a mandate of public policy to management.

Plaintiff also reiterated that he established a violation of a clear mandate of public policy.  Again, the judge disagreed, finding as follows:

Even if there exists a public policy mandate to keep gas out of the manholes, the fact remains that [p]laintiff never brought that issue to the attention of his superiors.  Such issue was only brought up to management by [p]laintiff's [U]nion representative within the context of his possible reprimand due to his failure to follow safety protocol.

The judge declined to consider plaintiff's argument, raised for the first time, that the judge failed to consider the temporal proximity of the complaints as evidence plaintiff was terminated as retaliation rather than for legitimate reasons.  The judge determined that even if he considered the argument, "it [did] little to bolster [p]laintiff's claims, as the temporal proximity to the alleged

11

complaints about the gas analyzers remains close in time to [p]laintiff's misleading statements regarding the use of gas analyzers, which is the reason PSE&G claims, in part, that it terminated plaintiff's employment." The judge also stated:

> As for the other arguments regarding final written warning, and other employees not getting fired . . . the court properly considered these facts in its previous ruling, and it is not necessary for the [c]ourt to retrace such arguments where [p]laintiff has failed to point to a wrongful analysis by the court or an area where the [c]ourt failed to consider the significance of such arguments.

## II.

On appeal, plaintiff argues the motion judge erred in denying his motion for reconsideration because his Union representative raised a sufficient expression of disagreement to PSE&G senior management at the fact-finding meeting about the faulty analyzers and dangerous gas in the manholes. Plaintiff also argues he established a violation of a clear mandate of public policy, was able to demonstrate issues of fact pertaining to PSE&G's reasons for terminating him, and the judge should have granted reconsideration in the interests of justice.

"Motions for reconsideration are governed by Rule 4:49-2, which provides that the decision to grant or deny a motion for reconsideration rests within the sound discretion of the trial court." Pitney Bowes Bank, Inc. v. ABC Caging

12

Fulfillment, 440 N.J. Super. 378, 382 (App. Div. 2015). "Reconsideration should be used only where '1) the [c]ourt has expressed its decision based upon a palpably incorrect or irrational basis, or 2) it is obvious that the [c]ourt either did not consider, or failed to appreciate the significance of probative, competent evidence.'" Ibid. (quoting Capital Fin. Co. of Delaware Valley, Inc. v. Asterbadi, 398 N.J. Super. 299, 310 (App. Div. 2008)).

"[A] trial court's reconsideration decision will be left undisturbed unless it represents a clear abuse of discretion." Ibid. "An abuse of discretion 'arises when a decision is "made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis."'" Ibid. (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)). Reconsideration is not appropriate as a vehicle to bring the court's attention to evidence not presented, although available, in connection with the initial argument. Fusco v. Bd. of Educ., 349 N.J. Super. 455, 463 (App. Div. 2002). Applying the above standards, we discern no reason to reverse.

Absent an employment contract, "employers or employees have been free to terminate the employment relationship with or without cause." Pierce, 84 N.J. at 65-66. To protect at-will employees from abusive practices by their employers, the Court has recognized a common law cause of action for at-will

employees "who were discharged for reasons that were in some way 'wrongful.'" Id. at 67. "In most cases of wrongful discharge, the employee must show retaliation that directly relates to an employee's resistance to or disclosure of an employer's illicit conduct." MacDougall v. Weichert, 144 N.J. 380, 393 (1996).

"In some cases, however, the employee may show that the retaliation is based on the employee's exercise of certain established rights, violating a clear mandate of public policy." Ibid. To that end, the employee "has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy." Pierce, 84 N.J. at 72; see also N.J.S.A. 34:19-1 to -8 (recognizing a statutory cause of action for retaliatory discharge; passed after Pierce). "[T]he mandate of public policy [must] be clearly identified and firmly grounded" and an alleged violation of a "vague, controversial, unsettled, and otherwise problematic public policy does not constitute a clear mandate." MacDougall, 144 N.J. at 391-92. "[S]ources of public policy include legislation; administrative rules, regulations or decisions; and judicial decisions." Mehlman v. Mobil Oil Corp., 153 N.J. 163, 181 (1998). Ibid. If an employee fails to point to a clear expression of public policy, a court "can grant a motion to dismiss or for summary judgment." Pierce, 84 N.J. at 73.

In addition, to support a <u>Pierce</u> claim, a plaintiff must show that he or she made a sufficient expression of a disagreement with a corporate policy, directive, or decision based on a clear mandate of public policy derived from legislation; administrative rules, regulations; or decisions, or judicial decisions. <u>Tartaglia</u>, 197 N.J. at 109; <u>Pierce</u>, 84 N.J. at 72. "[A] complaint to an outside agency will ordinarily be a sufficient means of expression, but a passing remark to co-workers will not. A direct complaint to senior management would likely suffice, but a complaint to an immediate supervisor generally would not."[3] <u>Tartaglia</u>, 197 N.J. at 109.

We have considered plaintiff's arguments in light of the record and applicable legal principles and conclude they are without sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E). We affirm substantially for the reasons the judge expressed in his written opinions granting summary judgment and denying reconsideration. However, we make the following comments.

---

[3] For this reason, what plaintiff said about the explosion on the day of the accident to a supervisor from the Clifton shop, who was no part of PSE&G senior management, is insufficient to support his <u>Pierce</u> claim. In any event, the record does not reveal that plaintiff made an expression to the supervisor of a disagreement with a corporate policy, directive, or decision based on a clear mandate of public policy.

A-4283-16T3

Plaintiff, himself, never complained to PSE&G senior management about faulty or unreliable analyzers. Rather, he advised senior management at the fact-finding meeting that he used his analyzer on the day of the incident, used it "all the time[,]" and it was functioning properly because he "heard it running as [he] went down the [man]hole." What plaintiff's Union representative said to senior management after plaintiff left the fact-finding meeting clearly contradicted what plaintiff said about the analyzer.

In any event, assuming the Union representative's statements at the fact-finding meeting are attributable to plaintiff,[4] the statement that "[n]one of [PSE&G's] analyzers are calibrated at the dock with the right times or dates" did not constitute a sufficient expression of a disagreement with a corporate policy or decision based on a clear mandate of public policy derived from legislation; administrative rules, regulations or decisions; or judicial decisions. The Union representative did not identify any public policy PSE&G allegedly violated by not calibrating the analyzers with the right times or dates, and the record contains no such public policy. Both the manual for the analyzers and the protocols set by the International Safety Equipment Association in the record

---

[4]  Plaintiff cites no authority supporting his proposition that a Union representative's statements made outside his presence are attributable to him.

recommend calibration only to ensure the "sensors and alarms respond to the gas within the manufacturer's acceptable limits." Similarly, OSHA mandates the calibration of equipment to ensure accuracy within a ten percent limit. See 29 C.F.R. § 1926.953(i). Calibration is not required to correct dates and times on the analyzers.

In fact, these sources, on which plaintiff's expert relied, do not mention any maintenance necessary to keep the dates and times accurate on the analyzers or mandate that analyzers have the correct time and date. Moreover, there is no evidence that incorrect dates and times on the analyzers will result in the analyzers failing to detect gas. Notably, plaintiff acknowledged that the dates and times had no impact on the analyzer's "ability to detect the toxins in the air quality[.]" As such, the Union representative's statement regarding the inaccurate dates times and days on the analyzers fells short of a sufficient disagreement based on a clear mandate of public policy. Tartaglia, 197 N.J. at 109.

In addition, plaintiff, himself, never complained to PSE&G senior management about dangerous gas in manholes. The Union representative's statements about the Newark incident did not constitute a sufficient expression of a disagreement with a corporate policy or decision based on a clear mandate

17

of public policy derived from legislation; administrative rules, regulations or decisions; or judicial decisions. The Union representative did not identify any public policy PSE&G allegedly violated with respect to gas in manholes. As such, the Union representative's statement regarding the Newark incident fell short of a sufficient disagreement based on a clear mandate of public policy. Tartaglia, 197 N.J. at 109. Accordingly, plaintiff failed to establish a Pierce claim, warranting the grant of summary judgment and the denial of his motion for reconsideration.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4283-16T3